**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

WAYNE T. MOULTON,

                Plaintiff,

v.                                     3:22-cv-00340 (AMN/ML)

COUNTY OF TIOGA, NY; TIOGA COUNTY
SHERIFF'S DEPARTMENT; GARY W.
HOWARD, individually and in his capacity as
Sheriff of Tioga County; and SHAWN J. NALEPA,
individually and in his capacity as Tioga County
Sheriff's Department Captain of Operations,

                Defendants.
_____

| APPEARANCES: | OF COUNSEL: |
|---|---|
| **SATTER RUHLEN LAW FIRM, PLLC** | **SARAH E. RUHLEN, ESQ.** |
| 217 South Salina Street, 6th Floor | |
| Syracuse, NY 13202 | |
| *Attorneys for Plaintiff* | |
| **THE LAW FIRM OF FRANK W. MILLER, PLLC** | **FRANK W. MILLER, ESQ.** |
| 677 Broadway, 9th Floor | **GIANCARLO FACCIPONTE,** |
| Albany, NY 12207 | **ESQ.** |
| *Attorneys for Defendants* | |

**Hon. Anne M. Nardacci, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.     INTRODUCTION

In this action, Plaintiff alleges that Defendants violated Plaintiff's constitutional and common law rights. *See* Dkt. No. 14 (the "Amended Complaint"). Defendants have moved to dismiss each of Plaintiff's claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See* Dkt. No. 16 (the "Motion").

For the reasons set forth herein, Defendants' Motion is granted in part and denied in part.

## II.      BACKGROUND

The following facts are drawn from the Amended Complaint and assumed to be true for purposes of ruling on the Motion.  *See Div. 1181 Amalg. Transit Union-N.Y. Emps. Pension Fund v. N.Y.C. Dep't of Educ.*, 9 F.4th 91, 94 (2d Cir. 2021) (*per curiam*).

### A.  The Parties

Plaintiff Wayne T. Moulton ("Plaintiff" or "Moulton") was hired by Defendant Tioga County Sheriff's Department ("TCSD") as a corrections officer in 1991, and subsequently began working as a police officer with the department in 1997.  *See* Dkt. No. 14 at ¶¶ 34-35.  Over the course of his career with TCSD, Plaintiff was promoted several times, with his final promotion to Undersheriff occurring in May 2019.  *See id*. at ¶¶ 37, 47-48.  Plaintiff ultimately resigned from TCSD effective May 18, 2020.  *Id*. at ¶ 73.

Defendant County of Tioga, New York ("Tioga") is a municipal corporation duly organized and existing under the laws of the State of New York.  *Id*. at ¶ 6.  Tioga hires, employs, supervises, and otherwise controls employees of TCSD.  *Id*. at ¶¶ 7-8.  Defendant TCSD is a "department and agency" of Tioga.  *Id*. at ¶ 9.  Defendant Sheriff Gary W. Howard ("Sheriff Howard") serves as the elected Tioga County Sheriff.  *Id*. at ¶ 11.  In his official capacity, Sheriff Howard is an agent, employee, and officer of Tioga and TCSD, sets Tioga and TCSD policies, and supervises Tioga and TCSD employees.  *Id*. at ¶¶ 13-15.  Defendant Captain Shawn J. Nalepa ("Captain Nalepa") serves as TCSD Captain of Operations, and in that capacity he is an employee and agent of Tioga and TCSD, subordinate to Sheriff Howard.  *Id*. at ¶¶ 17, 19-21.

### B.  Plaintiff's Factual Allegations

As detailed below, Plaintiff alleges that he repeatedly expressed his intent to run for Tioga County Sheriff, and spoke with members of the community to that end, from 2017 through 2021.

Plaintiff further alleges that, as a result of that activity, Sheriff Howard developed animus against him and engaged in a pattern of suppressing his protected speech, including by directing him not to state his intention to run for sheriff and directing him to resign from TCSD or be fired.  Plaintiff also alleges that both Sheriff Howard and Captain Nalepa transmitted false defamatory information to a state agency, which caused the removal of Plaintiff from a registry necessary to serve as sheriff or to serve in any other public law enforcement role.

### 1.  Plaintiff's Alleged Protected Conduct

In 2017, Plaintiff attended a leadership program hosted by the Tioga County Chamber of Commerce.  *See id*. at ¶ 38.  Sheriff Howard and other members of the community, including individuals not in public law enforcement, also attended this program.  *Id*.  During a part of the program when attendees introduced themselves to each other, Plaintiff stated that he "hope[d] to be the next sheriff when [Sheriff] Howard finishes his term."  *Id*.  At that time, Sheriff Howard was serving a term that was due to expire in 2019.  *See id*. at ¶ 45; *see also* Dkt. No. 16-1 at 8.[1]

Plaintiff reiterated his intention to be the next Tioga County Sheriff in "a speech about his campaign plans to the Owego Kiwanis Club in June, 2018."  Dkt. No. 14 at ¶ 39.  Plaintiff alleges that in this speech he specifically articulated that he intended to run following Sheriff Howard's term in office, and that Sheriff Howard was present for these remarks.  *Id*.  This event, and Plaintiff's participation in it, were not part of Plaintiff's official duties nor incidental to such.  *See id*. at ¶ 42.  Plaintiff also alleges that at some point Sheriff Howard asked Plaintiff who he would consider for the role of undersheriff if Plaintiff were elected sheriff, and Plaintiff named several individuals including then-TCSD Lieutenant Nathanial Marsh ("Marsh").  *See id*. at ¶¶ 43-44.

---

[1] Citations to docket entries utilize the pagination generated by CM/ECF docketing system and not the documents' internal pagination.

Plaintiff continued to position himself to run for Tioga County Sheriff "throughout 2019 through 2021," including at events for the Tioga County Boys & Girls Club ("TCBGC"). *See id.* at ¶¶ 50-51. Specifically, Plaintiff alleges that he participated in TCBGC events in June, August, October, and December of 2020, at which he discussed campaign topics including potential running mates, platform positions, campaign funding and signage, and public canvassing, with members of the community and at least one Tioga County political party official. *See id.* at ¶¶ 52-55. Plaintiff also alleges his participation in "informal weekly Thursday meetings" "[t]hroughout 2019 through 2021," where he "discuss[ed] potential running mates, platforms, and funding" with the same members of the community and at least one local political party official. *See id.* at ¶ 56. Similarly, Plaintiff alleges that he "attended Tioga County Republican Committee events" "[t]hroughout 2019 through 2021," including a "Christmas Dinner in December 2020" which Sheriff Howard also attended, where Plaintiff "spoke to his friends and neighbors about potential running mates, platforms, funding, canvassing, and campaign signage." *See id.* at ¶¶ 57-58. Finally, Plaintiff alleges that his protected activities caused no disruption to nor effect on Tioga or TCSD, and that his protected activities were done as a private citizen, involved matters of public concern, and were not done pursuant to his job duties. *See id.* at ¶¶ 62-63.

## 2. Plaintiff's Allegations of Defendants' Harmful Conduct

Plaintiff alleges that in early 2019, Sheriff Howard informed Plaintiff that he would be running for another term as Tioga County Sheriff and "asked Plaintiff not to state that [he] was considering running" anymore. *See* Dkt. No. 14 at ¶¶ 45, 140, 149. Plaintiff alleges that in response he told Sheriff Howard that he would retire from the TCSD, at which point Sheriff Howard offered Plaintiff the position of undersheriff. *See id.* at ¶¶ 46-47. Plaintiff accepted the offer and was promoted to undersheriff in May of 2019, while he continued publicly to discuss his

intention to run for sheriff.  *See id*. at ¶¶ 48, 50.  The undersheriff position had a one-month probationary period, after which Plaintiff's role became permanent.  *See id*. at ¶ 49.

Next, Plaintiff alleges that on or around May 8, 2020, Sheriff Howard accused Plaintiff, Marsh, and then-TCSD Senior Investigator Timothy Schmidt ("Schmidt") of drinking on the job when they were not.  *See id*. at ¶¶ 64-66.  Plaintiff alleges that in response to the false accusation, he "requested an opportunity to defend himself" including by taking a sobriety test, which he alleges he would have passed, and which Sheriff Howard did not allow.  *See id*. at ¶¶ 67-68, 70-71.  Instead, Plaintiff alleges Sheriff Howard told Plaintiff to "[r]etire now or you are fired."  *Id*. at ¶ 69.  Believing that Sheriff Howard had the authority to terminate Plaintiff's employment at will, Plaintiff resigned effective May 18, 2020.  *See id*. at ¶¶ 72-73.

Plaintiff alleges that the next month, on June 18, 2020, TCSD reported Plaintiff's resignation as a "retirement" to the New York State Division of Criminal Justice Services ("DCJS").[2]  *See id*. at ¶ 74.  DCJS maintains a registry of all police and peace officers who successfully complete basic training in the state (the "Registry").  *See id*. at ¶¶ 26-27 (citing New York State Exec. L. § 854 and 9 NYCRR § 6056.1 *et seq*.).  Plaintiff alleges that a public employer must submit the name of each officer whom they have ceased to employ to DCJS on January 15 of each year, *see id*. at ¶ 28 (citing Exec. L. § 9845(d) and 9 NYCRR § 6056.5(d)), and must immediately inform DCJS when an officer ceases to serve as the result of a removal for cause, *see id*. at ¶ 29 (citing Exec. Law §845(d) and 9 NYCRR § 6056.4(c)).  Further, law enforcement officers with public New York employers remain in good standing on the Registry throughout their employment and for four years thereafter, so long as they are not removed "for cause."  *See id*. at

---

[2] Plaintiff also received a "Retired Officer" badge upon his resignation, which allowed him to continue to carry a concealed weapon, and which are only provided to officers who leave police service in good standing.  *See id*. at ¶¶ 78-79 (citing 18 U.S.C. § 926C).

¶¶ 24-25 (citing Gen. Mun. L. § 209-q(1)(b)(i)(c)).  Plaintiff alleges that at all times relevant to his allegations, the New York Civil Rules and Regulations defined "removal for cause" to include an employee's resignation or retirement while a disciplinary process has been commenced.  *See id*. at ¶ 33 (citing 9 NYCRR § 6056.2).

Plaintiff alleges that he was entered onto the Registry in 1997 when he completed the Municipal Police Training Council Basic Training Program to become a TCSD police officer, *see id*. at ¶¶ 35-36, and that he remained on the Registry throughout his employment and the year immediately following, *see id*. at ¶ 81.  However, on or about May 18, 2021, to Plaintiff's great surprise, he received notice from DCJS that his name had been removed from the Registry because TCSD had informed DCJS that Plaintiff had ceased to work at TCSD due to alleged incompetence or misconduct.  *See id*. at ¶¶ 90-91.

### 3.  Plaintiff's Alleged Injuries

Upon filing a freedom of information request and receiving responsive information, Plaintiff alleges that he discovered that Sheriff Howard and Captain Nalepa had each sent letters to DCJS dated May 3, 2021, falsely stating in relevant part that "prior to [Plaintiff's] effective retirement date a disciplinary proceeding had commenced for incompetence and/or misconduct and [such process] was not concluded prior to his retirement."  *Id*. at ¶¶ 92-98, 141.  Plaintiff further alleges that Sheriff Howard ordered Captain Nalepa, his subordinate, to prepare and submit his letter in the course of his official duties as an employee and agent of Tioga and TCSD.  *See id*. at ¶¶ 99-102.  Plaintiff alleges that the statements were false because "Defendants never implemented any type of disciplinary proceeding whatsoever against Plaintiff" by the time TCSD first reported his departure to DCJS in June of 2020, and if there had been a proceeding it was undertaken without providing notice to Plaintiff or an opportunity for him to participate at any

point.[3]  *See id*. at ¶¶ 103-09.  In light of the foregoing, Plaintiff alleges that Defendants had no reason to make false statements to DCJS about Plaintiff's resignation a year after Plaintiff resigned, with no intervening developments besides Plaintiff's protected conduct.  *See id*. at ¶ 120.  Plaintiff unsuccessfully attempted to get Defendants to correct their false statements by filing arguments on issues of law and fact with Tioga in August of 2021, and filing a sworn Notice of Claim with Tioga in September of 2021.  *See id*. at ¶¶ 130-36.

Plaintiff alleges that his removal from the Registry denied him an existing protected liberty interest and legally forecloses him from serving in any law enforcement position, elected or otherwise.[4]  *See id*. at ¶¶ 2, 77, 110-13, 167-69.  Moreover, Plaintiff alleges that when individuals are removed from the Registry—as Plaintiff was—they end up on a different public list called the Police/Peace Officer Decertification List ("Decertification List"), which includes the individuals' names, former employers, and reasons for decertification in general terms.  *See id*. at ¶¶ 114-15. As a result of being on this public list, Plaintiff alleges that his good name, reputation, honor, and integrity have been called into question for a job he performed for over two decades, which has imposed a stigma on Plaintiff and injured his reputation, standing, and character.  *See id*. at ¶¶ 116-17, 170.  Plaintiff alleges that this was the outcome intended by Sheriff Howard and his employer as retaliation for Plaintiff's protected conduct in positioning himself to compete against Sheriff

---

[3] Plaintiff specifically alleges that he was never questioned or investigated by TCSD or Tioga's human resources department; never received a notice of disciplinary action; was not informed of a disciplinary process beyond Sheriff Howard's accusation; was denied attempts to defend himself; and never received any other details of any alleged misconduct.  *See* Dkt. No. 14 at ¶¶ 104-06.

[4] Plaintiff alleges that Marsh—whom Plaintiff had earlier identified as a potential undersheriff were he elected sheriff, and who was also accused of drinking on the job by Sheriff Howard— resigned from TCSD effective May 15, 2020, and that TCSD reported Marsh's departure as a "resignation" to DCJS.  *See id*. at ¶¶ 82-83.  Plaintiff also alleges that Schmidt—who had also been accused of drinking on the job by Sheriff Howard, but had never been implicated in Plaintiff's political ambitions—neither resigned nor retired.  *See id*. at ¶¶ 86-88.  Plaintiff alleges that—unlike himself—both Marsh and Schmidt remain in good standing on the Registry.  *See id*. at ¶¶ 84, 89.

Howard in the next election.  *See id.* at ¶¶ 123-29.

### C.  The Instant Action and Motion

On April 11, 2022, Plaintiff filed a Complaint against Defendants—Tioga; TCSD; Sheriff Howard, individually and in his official capacity; and Captain Nalepa, individually and in his official capacity—alleging violations of the Civil Rights Act, 42 U.S.C. § 1983 ("Section 1983"), and common law defamation.  *See* Dkt. No. 1.  Following a pre-motion conference on June 9, 2022, the Court permitted Plaintiff to file an amended complaint, and set a briefing schedule for Defendants' anticipated motion to dismiss.  On June 22, 2022, Plaintiff timely filed an Amended Complaint.  Dkt. No. 14.  In the Amended Complaint, Plaintiff asserts seven causes of action against Defendants: (i) First Amendment violation pursuant to Section 1983; (ii) First Amendment retaliation pursuant to Section 1983; (iii) stigma-plus Fourteenth Amendment violation pursuant to Section 1983; (iv) *Monell* liability; (v) Defamation; (vi) Defamation *per se*; and (vii) *respondeat superior* liability.[5]  *See id.* at ¶¶ 137-209.

On July 6, 2022, Defendants timely filed the Motion seeking to dismiss each of Plaintiff's claims in the Amended Complaint.[6]  Dkt. No. 16.  On August 12, 2022, Plaintiff timely filed an Opposition in response to the Motion, Dkt. No. 19, and on August 19, 2022, Defendants filed a Reply in support of the Motion, Dkt. No. 20.

The Motion is thus ripe for determination.

---

[5] Plaintiff asserts each claim against each Defendant other than Plaintiff's *Monell* liability and *respondeat superior* liability claims, which are solely brought against Tioga and TCSD.  *See* Dkt. No. 14 at ¶¶ 178, 209; *see also* Dkt. No. 19 at 30 ("*Monell* liability is pled with respect to the County's and Sheriff's Department's failure to control and train Howard and Nalepa.").

[6] In support of the Motion, Defendants submitted a memorandum of law, Dkt. No. 16-1, an attorney affidavit, Dkt. No. 16-3, and an exhibit, which Defendants aver to be a true and accurate copy of a letter referenced and quoted in part in the Amended Complaint, *see* Dkt. No 16-3 at ¶ 4; *compare* Dkt. No. 14 at ¶ 95, *with* Dkt. No. 16-2.

III.      STANDARD OF REVIEW

A motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6) tests the legal sufficiency of a party's claim for relief.  *See Patane v. Clark*, 508 F.3d 106, 111-12 (2d Cir. 2007).  In considering legal sufficiency, a court must accept as true all well-pled facts in the complaint and draw all reasonable inferences in the pleader's favor.  *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (citation omitted).  This presumption, however, does not extend to legal conclusions.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  Although a court's review of a motion to dismiss is generally limited to the facts presented in the pleadings, the court may consider documents that are "integral" to the pleadings even if they are neither physically attached to, nor incorporated by reference into, the pleadings. *See Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002)).

To survive a motion to dismiss, a party need only plead "a short and plain statement of the claim," Fed. R. Civ. P. 8(a)(2), with sufficient factual "heft to show that the pleader is entitled to relief," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (quotation omitted).  Under this standard, a pleading's "[f]actual allegations must be enough to raise a right of relief above the speculative level," *id.* at 555 (citation omitted), and present claims that are "plausible on [their] face," *id.* at 570.  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Iqbal*, 556 U.S. at 678 (citation omitted).  "Where a complaint pleads facts that are merely consistent with a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).  Ultimately, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief," *Twombly*, 550 U.S. at 558, or where a plaintiff

has "not nudged [its] claims across the line from conceivable to plausible, the … complaint must be dismissed." *Id.* at 570.

## IV.    DISCUSSION

Defendants seek to dismiss each of Plaintiff's claims against each Defendant.

### A.  Plaintiff's Claims of Constitutional Violations

Plaintiff's Amended Complaint alleges three constitutional claims: (1) a violation of Plaintiff's First Amendment rights based on Defendants' alleged suppression of Plaintiff's protected speech; (2) a violation of Plaintiff's First Amendment rights based on Defendants' alleged retaliation against Plaintiff as a result of his exercise of his First Amendment right to free speech; and (3) a stigma-plus violation of Plaintiff's Fourteenth Amendment due process rights.

#### 1.  Plaintiff's First Amendment Claims

A public employee pleading a First Amendment claim "must allege facts plausibly suggesting that '(1) the speech at issue was made as a citizen on matters of public concern rather than as an employee on matters of personal interest, (2) he or she suffered an adverse employment action, and (3) the speech was at least a substantial or motivating factor in the adverse employment action.'" *Rissetto v. Cnty. of Clinton*, No. 8:15-CV-720 (GTS/CFH), 2016 WL 4530473, at *18 (N.D.N.Y. Aug. 29, 2016) (alterations omitted) (quoting *Johnson v. Ganim*, 342 F.3d 105, 112 (2d Cir. 2003)).  Once a plaintiff makes such showing, defendants may "escape liability if they can demonstrate that either (1) the defendant would have taken the same adverse action against the plaintiff regardless of the plaintiff's speech; or (2) the plaintiff's expression was likely to disrupt the government's activities and that the harm caused by the disruption outweighs the value of the plaintiff's expression"—known as the *Pickering* balancing test.  *Frisenda v. Inc. Vill. of Malverne*, 775 F. Supp. 2d 486, 503 (E.D.N.Y. 2011) (citing *Cobb v. Pozzi,* 363 F.3d 89, 101-02 (2d Cir.

2004) and referencing *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968)).  If the defendant "prevails on the *Pickering* test, plaintiff may still succeed by showing that the adverse action was in fact motivated by retaliation and not by any fear of a resultant disruption." *Id*. (citing *Reuland v. Hynes,* 460 F.3d 409, 415 (2d Cir. 2006)).

"To prevail on a First Amendment claim, a plaintiff need show only that her protected speech was 'a substantial or motivating factor'" for the adverse action.  *Dushane v. Leeds Hose Co. #1 Inc.*, 6 F. Supp. 3d 204, 212 (N.D.N.Y. 2014) (quoting *Board of Comm'rs, Wabaunsee Cnty. v. Umbehr,* 518 U.S. 668, 675 (1996)); *accord Debell v. Maimonides Med. Ctr.,* No. 09-CV-3491, 2011 WL 4710818, at *10 (E.D.N.Y. Sept. 30, 2011) (plaintiff need only show "that his [protected activity] was at least one motivating factor" of an adverse action).  Even where a public employee does not engage in protected political activity, if they are deprived of a right secured by the Constitution based on perceived participation in such activity, that deprivation could present a Sec. 1983 claim.  *Heffernan v. City of Paterson, N.J.*, 578 U.S. 266, 268 (2016).

Defendants move to dismiss Plaintiff's claims under the First Amendment on the grounds that Plaintiff did not sufficiently allege any protected activity, and that even if he did, he did not sufficiently allege that he suffered any adverse actions causally linked to his protected activity.[7] *See* Dkt. No. 16-1 at 13-22.

### a.  Whether Plaintiff Has Sufficiently Pled Protected Conduct

Defendants present two arguments that Plaintiff's alleged speech was not protected

---

[7] Defendants do not appear to distinguish between Plaintiff's first and second causes of action, *see, e.g.*, Dkt. No. 16-1 at 18 (noting that the "second element of a claim of first amendment violation or retaliation is that Plaintiff must claim he suffered an adverse action" and citing a First Amendment retaliation discussion in *Cioffi v. Averill Park Cent. Sch. Dist. Bd. Of Educ.*, 444 F.3d 158, 162 (2d Cir. 2006)), and Plaintiff similarly addresses his First Amendment claims in unison, *see* Dkt. No. 19 at 12.  For the purpose of deciding the Motion, the Court follows suit.

conduct: that the speech did not sufficiently concern matters of public interest, and that the speech was merely unspecific utterances.

The initial First Amendment inquiry "encompasses two separate subquestions: (1) whether the subject of the employee's speech was a matter of public concern and (2) whether the employee spoke as a citizen rather than solely as an employee."[8] *Matthews v. City of New York*, 779 F.3d 167, 172 (2d Cir. 2015) (quotation omitted). Speech addresses a "public concern when it relates to a matter of political, social or other concern to the community." *Giachetto v. Patchogue-Medford Union Free Sch. Dist.*, 413 F. Supp. 3d 141, 144 (E.D.N.Y. 2016); *accord Ruotolo v. City of New York*, 514 F.3d 184, 189 (2d Cir. 2008) ("The heart of the matter is whether the employee's speech was 'calculated to redress personal grievances or whether it had a broader public purpose.'") (quoting *Lewis v. Cowen*, 165 F.3d 154, 163-64 (2d Cir. 1999)). "Whether an employee's speech addresses a matter of public concern is a question of law for the court to decide, taking into account the content, form, and context of a given statement as revealed by the whole record." *Rissetto*, 2016 WL 4530473, at *19 (quoting *Ruotolo*, 514 F.3d at 189).

Defendants are correct that, where an individual is a public employee, speech "of a personal concern" or "where the employee's 'overriding interest' is personal," is not protected. *See* Dkt. No. 16-1 at 14 (quoting *Grennan v. Nassau Cnty.*, No. 04-2158 (DRH) (WDW), 2007 WL 952067, at *8 (E.D.N.Y. Mar. 29, 2007)). However, although courts have found a plaintiff's allegations of protected conduct insufficient where the speech in question concerned matters within the scope of a plaintiff's employment, *see, e.g.*, *Ruotolo*, 514 F.3d at 190 ("generalized public interest in the fair or proper treatment of public employees is not enough"), where there is a component of public

---

[8] The First Amendment protects the rights of public employees "in certain circumstances, to speak as a citizen addressing matters of public concern." *Shara v. Maine-Endwell Cent. Sch. Dist.*, 46 F.4th 77, 82 (2d Cir. 2022) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006)).

interest in the job, that has been found sufficient to establish plausible protected activity, *see Rotundo v. Vill. Of Yorkville,* No. 6:09-CV-1262, 2011 WL 838892, at *5 (N.D.N.Y. Mar. 4, 2011) ("employee seeking to bring to light actual or potential wrongdoing or a breach of public trust by public employees or agencies is addressing a matter of public concern") (collecting cases); *Gusler v. City of Long Beach*, 823 F. Supp. 2d 98, 124-25 (E.D.N.Y. 2011) ("even where a person is '*motivated by* a personal grievance,' they may still be speaking on a matter of public concern") (quoting *Sousa v. Roque*, 578 F.3d 164, 174 (2d Cir. 2009)).

As pled, Plaintiff's speech is sufficiently related to matters of public concern.  Indeed, there is no requirement that Plaintiff's allegedly protected speech be focused on any particular election- or campaign-related issues in order to be protected.  *See, e.g.*, *Hueston v. City of New York*, No. 00 Civ. 9512 (RCC), 2005 WL 53256, at *7-8 (S.D.N.Y. Jan. 10, 2005) (holding that even though plaintiff's statements encompassed "personal problems with working conditions," the statements were a matter of public concern where they also "addressed an issue of fundamental importance to local government").  Thus, Defendants' contention that Plaintiff did not take specific action to formally establish himself as a political candidate for office, *see* Dkt. No. 20 at 7, is insufficient to warrant dismissal of Plaintiff's claim.  Although Defendants cite many activities in which Plaintiff *could* have engaged that Defendants concede would qualify as protected conduct, Defendants cite no authority for the proposition that certain activities, like formally announcing a candidacy or making campaign signs, are necessary to qualify as protected conduct.[9]  *See* Dkt. No. 20 at 7.

---

[9] The Court notes that, on this point, several of Defendants' contentions are contrary to the allegations in the Amended Complaint, which must be accepted as true for purposes of the Motion. *E.g., compare* Plaintiff's allegations of steps he took to campaign, including discussing potential running mates, platform positions, campaign funding and signage, and public canvassing, with members of the community and at least one Tioga County political party official, *see supra* Sec. II.B.1, *with* Dkt. No. 16-1 at 15-16 ("Plaintiff's amended facts confirm that he took no steps to campaign as sheriff").

Taking the allegations in the Amended Complaint as true, as the Court must, it is clear that the speech at issue encompasses the entirety of Plaintiff's campaign activity, whether formal or informal, directed at serving as the next elected Tioga County Sheriff.  Such speech concerns the public.  *Enders v. Boone*, No. 1:19-cv-948 (BKS/CFH), 2023 WL 2265173, at *10 (N.D.N.Y. Feb. 28, 2023), *on reconsideration*, 2023 WL 3020039 (N.D.N.Y. Apr. 20, 2023) (observing that "campaigns for public office, generally speaking, are likely to 'relate to matters of political, social, or general interest to the community or value and concern to the public'") (quoting *Specht v. City of New York*, 15 F.4th 594, 600 (2d Cir. 2021)); *Dushane*, 6 F. Supp. 3d at 211 ("in light of Leeds's public-serving firefighting functions … it is entirely plausible, and indeed quite likely, that some speech incident to Plaintiff's campaigning … against the reelection of [an incumbent] touched on matters of public concern"); *Bachus v. Schenectady City Sch. Dist.,* No. 09-CV-0843 (GTS/RFT), 2011 WL 500540, at *9 & n.6  (N.D.N.Y. Feb. 10, 2011) (finding that plaintiff's announcement that he intended to run for president of a union constituted protected speech and collecting cases); *see also Hellstrom v. U.S. Dep't of Veterans Affs.*, 46 F. App'x 651, 655 n.4 (2d Cir. 2002) (observing that courts have "held that a public college employee's endorsement of nonincumbent candidates for positions on the board of trustees involved speech on a matter of public concern").[10]

Second, Plaintiff's allegations are sufficiently specific so as to plausibly allege that he engaged in protected speech.  While Plaintiff may not have provided transcripts of his campaign- or election-related speech, there is no requirement that he do so.  *See, e.g.*, *Bachus*, 2011 WL 500540, at *9 & n.6.  Moreover, he provides ample details on the timing, venues, participants, and subject matters of his many instances of plausibly protected speech.  *See supra* Sec. II.B.1.  In

---

[10] The Court finds the out-of-circuit authority presented by Plaintiff to be persuasive as well.  *See* Dkt. No. 19 at 12-13 (citing Third, Fourth, Fifth, Sixth, Ninth, and Tenth Circuit authority).

addition, Defendants cite *Giachetto v. Patchogue-Medford Union Free Sch. Dist.*, 413 F. Supp. 3d 141, 144 (E.D.N.Y. 2016), in support of their contention that Plaintiff has not sufficiently alleged specific utterances.  Dkt. No. 16-1 at 17.  *Giachetto* is also inapposite.  In that case, the court found the pleadings inadequate in part because by the plaintiff's own admission the one alleged instance of protected speech occurred outside the relevant timeframe for the action, and in part because plaintiff failed to identify how the speech involved matters of public concern.  Here, Plaintiff's allegations span protected conduct occurring from 2017 through 2021 and involved topics related to a local election for public office and campaigning for such office.[11]  *See supra* Sec. II.B.1.

In short, although Defendants dispute a number of Plaintiff's factual allegations of protected conduct in the Amended Complaint, it would be improper for the Court to decide these disputes on a motion to dismiss.  *See Twombly*, 550 U.S. at 557 (a party need only plead a short and plain statement of the claim with sufficient factual heft to show that the pleader is entitled to relief); *see also Dushane*, 6 F. Supp. 3d at 212 ("an employer's retaliatory *vel non* motivation is particularly ill-suited for resolution on a motion to dismiss") (citing *Gallo v. Prudential Residential Servs., LP*, 22 F.3d 1219, 1224 (2d Cir. 1994)).  Plaintiff has satisfied his burden to plead that his speech was sufficiently specific and about a matter of public concern.

### b.  Whether Plaintiff Has Sufficiently Pled Adverse Consequences

Once a plaintiff has established protected conduct, courts proceed to the second step of the *Pickering* analysis: "whether the relevant government entity 'had an adequate justification for treating the employee differently from any other member of the public based on the government's

---

[11] Defendants' argument on this point is again contrary to the explicit allegations in the Amended Complaint.  *See, e.g.*, Dkt. No. 16-1 at 17 ("Plaintiff only claims that he had several private conversations about his dreams of becoming sheriff … *before* being promoted by Defendant Howard") (emphasis added); Dkt. No. 20 at 8 (again relying on *Giachetto*).

needs as an employer.'" *Matthews*, 779 F.3d at 172 (quoting *Lane v. Franks*, 573 U.S. 228, 242 (2014), and citing *Pickering*, 391 U.S. 564). Retaliation against a public employee "can include 'discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand,' or may include 'lesser actions' such as 'negative evaluation letters, express accusations of lying, … transfer [in job duties] as an alleged demotion, and assignment … which aggravated [plaintiff's] physical disabilities.'" *Seale v. Madison Cnty.*, No. 5:11-CV-0278 (GTS/ATB), 2015 WL 667531, at *15 (N.D.N.Y. Feb. 17, 2015) (alterations added) (quoting *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 226 (2d Cir. 2006)). "[F]or 'lesser actions' to constitute an adverse employment action, they 'must be more disruptive than a mere inconvenience or an alteration of job responsibilities.'" *Murray v. Town of N. Hempstead*, 853 F. Supp. 2d 247, 264 (E.D.N.Y. 2012) (quoting *Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 207 (2d Cir. 2006)). Finally, a former employee may be state a claim for retaliation predicated on "tangible *future* employment objectives" frustrated by defendant, including if the defendant "'blacklists' the former employee … or sullies the plaintiff's reputation."[12] *Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 466 (2d Cir. 1997) (citations omitted); *accord McGrier v. Cap. Cardiology*, No. 1:20-cv-1044 (BKS/DJS), 2022 WL 2105854, at *19 (N.D.N.Y. June 10, 2022).

Defendants argue that all of the adverse actions alleged in the Amended Complaint "are postretirement issues, save for [the] retirement itself[,]"[13] and therefore "Plaintiff must show that he suffered an adverse" constructive discharge, which he cannot do. Dkt. No. 16-1 at 18.

---

[12] Notably, "the standard for establishing an adverse action in a First Amendment retaliation claim is more inclusive than the standard of 'materially adverse change in the terms and conditions of employment' which is required in Title VII [employment] discrimination claims." *Esar v. JP Morgan Chase Bank N.A.*, No. 15-CV-382 (NGG) (PK), 2018 WL 2075421, at *7 (E.D.N.Y. May 3, 2018) (quotation omitted).

[13] Plaintiff does not allege his resignation as a basis for his constitutional claims. *Cf.* Dkt. No. 14 at ¶¶ 139-44, 148-54, 158-69.

### i.  Plaintiff's Alleged Pre-Resignation Adverse Consequences

Defendants attempt to sidestep the first instance of alleged suppression of Plaintiff's protected First Amendment conduct: Sheriff Howard directing Plaintiff to stop stating that Plaintiff was considering running for sheriff.  *See* Dkt. No. 14 at ¶ 45.  Defendants acknowledge that in 2019 Plaintiff informed Sheriff Howard that he was going to retire, Dkt. No. 20 at 6-7, but treat that statement as existing in a vacuum, essentially ignoring the alleged statement by Sheriff Howard that Plaintiff alleges caused him to express his intention to retire.  *See* Dkt. No. 14 at ¶¶ 43-48; Dkt. No. 19 at 19-20 (describing the "intervening pattern of [Defendants'] antagonism to [Plaintiff's] political plans").  Indeed, as Defendants read the Amended Complaint, "Plaintiff specifically alleges … that his comments about his dreams of becoming sheriff one day never had any effect on his employment or work environment prior to" Sheriff Howard's accusations that Plaintiff was drinking while on duty.  Dkt. No. 16-1 at 19 (citing Plaintiff's allegations that his statements caused no disruptions to TCSD activities); *see also id*. at 21 (incorrectly asserting that "Plaintiff goes out of his way to allege that there were no issues of retaliation or free speech violations prior to his 2020 misconduct").  Defendants' arguments are again contrary to the explicit allegations in the Amended Complaint.

The second pre-resignation adverse consequence pled in the Amended Complaint is Sheriff Howard's directive to Plaintiff to "retire or be fired," in tandem with the denial of an opportunity to prove himself innocent or otherwise defend himself, when Sheriff Howard falsely accused Plaintiff, Marsh, and Schmidt of drinking while on duty.  *See supra* Sec. II.B.2; Dkt. No. 19 at 16 ("Plaintiff reasonably understood that he had no choice in the matter when Howard issued his ultimatum").  Defendants' arguments that these allegations are insufficient to plead an adverse consequence are unavailing.  For example, Defendants' reliance on *Jackson v. City Univ. of New*

*York*, No. 05 CIV. 8712 (JSR), 2006 WL 1751247 (S.D.N.Y. June 23, 2006), is misplaced because in that case "plaintiff explained that he felt 'forced' to resign solely because his supervisor asked him to sign the resignation form" without a threat of termination.  *Id*. at \*4; *cf*. Dkt. No. 20 at 9-10 (citing *Jackson*).   Further, Defendants concede that to establish constructive discharge, a plaintiff can allege the option to resign or be terminated if they reasonably believe that resignation is the only option, *see* Dkt. No. 20 at 10,—precisely what Plaintiff alleges.   *Compare id*. ("Plaintiff[] … provides no illumination as to what facts … would have led him to conclude, as a reasonable person, he must resign because of [Sheriff] Howard's misconduct allegation"), *with* Dkt. No. 19 at 16 (citing the Amended Complaint allegations that in addition to Sheriff Howard's accusation, Sheriff Howard denied Plaintiff any opportunity to clear his name).[14]

Accordingly, Plaintiff sufficiently alleges that Sheriff Howard stifled Plaintiff's protected speech before Plaintiff resigned by first directing him not to continue expressing his intentions to run for sheriff, and then demanding Plaintiff resign after falsely accusing Plaintiff of drinking while on duty, without allowing Plaintiff to defend himself.  *See Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1188-89 (2d Cir. 1987) (finding a question of fact from which "[a] trier of fact might find that [the] statement alone suffices to establish a constructive discharge" where a manager stated that an employee would be fired regardless of any efforts he made to improve his performance); *Dushane*, 6 F. Supp. 3d at 211-12 (observing that a "plaintiff's candidacy cannot be

---

[14] The Court again notes that Defendants' arguments on this point are contrary to the allegations in the Amended Complaint.  *Compare* Dkt. No. 20 at 10 ("[A] reasonable person … would have exercised their rights or objected in some way.  Plaintiff does not allege he did any such thing."), *with, e.g.*, Dkt. No. 14 at ¶ 67 ("When [Sheriff] Howard made the accusation, Plaintiff requested an opportunity to defend himself"); ¶ 69 (Sheriff "Howard refused to allow Plaintiff to say anything" in response to the accusation); ¶ 71 (Sheriff "Howard did not afford [Plaintiff] the opportunity to defend himself or to take a sobriety test, which he would have passed, and which would have exonerated him"); ¶ 107 ("Plaintiff's request to defend himself was flatly denied by [Sheriff] Howard").

burdened because a state official wishes to discourage that candidacy without a whisper of valid state interest").

### ii. Plaintiff's Alleged Post-Resignation Adverse Consequences

While Defendants did (unsuccessfully) address Plaintiff's constructive discharge allegations, they all but ignore the primary retaliatory injury Plaintiff alleges: his removal from the Registry resulting in his inability to hold any public law enforcement position, including sheriff. *See supra* Sec. II.B.3.  As Plaintiff describes it, this action functioned as "blacklisting" Plaintiff from prospective future employment, Dkt. No. 19 at 15, and evidenced animus because Plaintiff was treated differently from similarly accused employees Marsh and Schmidt, *id*. at 20. Defendants' sole argument on point, that none of "Plaintiff's other qualms with Defendants … are adverse actions for the purpose of his" First Amendment claims, is asserted without citation to authority.  Dkt. No. 16-1 at 20.  Indeed, the alleged consequences Plaintiff experienced after he resigned from TCSD qualify as adverse actions.  *See, e.g.*, *Wanamaker*, 108 F.3d at 466; *accord McGrier*, 2022 WL 2105854, at *19.

Rather than engage with Plaintiff's allegations, Defendants argue that the "May 2021 letter[15] took place long after Plaintiff had voluntarily retired, was administrative in nature, and did not pertain to any current employment venture by Plaintiff."  Dkt. No. 16-1 at 20.  Even when considered together with Defendants' factual assertions in their Motion that "New York State law does not require an active license to carry a firearm or any basic police training requirements to serve as Sheriff" and "nothing alleged in the Complaint [] prevents Plaintiff from engaging in the procedure [to run for sheriff] outlined in the election law[,]" *see* Dkt. No. 16-1 at 8, Defendants fail to address Plaintiff's allegations about the essential nature of the Registry, which is that "public

---

[15] Notably, Plaintiff alleges that *two* letters were sent with this date.  *See* Dkt. No 14 at ¶¶ 94-98.

employers are not allowed to hire a police officer into a law enforcement position, and Moulton cannot run for Sheriff if he is not listed on the Registry."  Dkt. No. 19 at 23-24 (citing Dkt. No. 14 at ¶ 24; NY Crim. Pro. L. § 2.30; NY Gen. Mun. L. § 209-q).  On Reply, Defendants continue to miss the mark by focusing on "good guy" letters—not the Registry at issue in the Amended Complaint.[16]  *See* Dkt. No. 20 at 8-9.

Removal from the Registry has been found to create a question of fact as to whether it constitutes an adverse employment action.  *See, e.g.*, *Comerford v. Vill. of N. Syracuse*, No. 5:18-cv-1143 (BKS/TWD), 2021 WL 950974, at *24 (N.D.N.Y. Mar. 12, 2021) (concluding that "Plaintiff [] raised a material issue of fact as to whether [police chief's] decertification of her police training [while still employed] was an adverse employment action").  Accordingly, Plaintiff has plausibly alleged that Defendants' actions purposefully resulted in Plaintiff being "blacklisted" from law enforcement roles, *see* Dkt. No. 19 at 15, including his articulated goal of being Tioga County Sheriff.  *See Calise v. Casa Redimix Concrete Corp.*, No. 20 Civ. 7164 (PAE), 2022 WL 355665, at *6 (S.D.N.Y. Feb. 4, 2022) (finding that retaliatory "blacklisting, or interfering with future employment opportunities, can constitute an adverse employment action" and collecting in-circuit authority).

### c.  Whether Plaintiff Has Sufficiently Pled a Causal Connection

Having determined that Plaintiff adequately alleged that he engaged in protected conduct

---

[16] Plaintiff characterizes the arguments in Defendants' Motion as addressing "nonexistent pleadings in order to rely, irrelevantly, on a determination that a New York City police officer has no entitlement to something called a 'good guy letter.'"  Dkt. No. 19 at 24 (discussing *Oquendo v. City of New York*, 492 F. Supp. 3d 20, 28 (E.D.N.Y. 2020)).  On Reply, Defendants ignore Plaintiff's argument, choosing instead to continue to discuss and cite case law concerning discretionary "good guy" letters.  *See* Dkt. No. 20 at 8-9.  The Court agrees with Plaintiff's analysis distinguishing discretionary "good guy" letters—unique to law enforcement officers in New York City—and the "nondiscretionary" legal process for status on the Registry outlined in the Amended Complaint and confirmed by Defendants, *see* Dkt. No. 16-1 at 31 (citing 9 CRR-NY 6056.4).

and suffered adverse consequences, the Court now considers causation.  "To establish causation, a plaintiff 'must show that the protected speech was a substantial motivating factor in the adverse employment action.'"  *Rotundo v. Vill. of Yorkville*, No. 6:09-CV-1262, 2011 WL 838892, at *6 (N.D.N.Y. Mar. 4, 2011) (quoting *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 167 (2d Cir. 2006)).  "A plaintiff may establish causal connection indirectly by showing temporal proximity between the protected activity and the adverse action."  *Cioffi*, 444 F.3d at 167 (citing *Gorman-Bakos v. Cornell Co-op Ext. of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001)).  However, "[t]emporal proximity is just one method of demonstrating causation, and therefore the absence of temporal proximity does not demonstrate conclusively a lack of causation."  *Dushane*, 6 F. Supp. 3d at 212 (quotation omitted).

Defendants argue that Plaintiff does not establish a causal nexus between the alleged protected conduct and adverse consequences because an intervening causal event occurred, and that even if they are connected, too much time elapsed and between the alleged protected conduct and any adverse consequences.  *See* Dkt. No. 16-1 at 20-22; Dkt. No. 20 at 10-12.

### i.  Demonstrated Nexus

First, it is clear that Sheriff Howard's direction to Plaintiff to stop expressing his intention to run for Tioga County Sheriff is substantially related to Plaintiff's plausibly protected conduct, and Defendant offers no argument to the contrary.  Second, whether Sheriff Howard directing Plaintiff to resign or be fired is sufficiently linked to the alleged protected conduct is a closer question.  Accepting the well-pled factual assertions in the Amended Complaint as true, however, Plaintiff has clearly alleged Sheriff Howard's animus to Plaintiff's aspirations.  *See*, *e.g.*, *Terry v. Cnty. of Cayuga*, No. 5:11-CV-1296 (LEK/ATB), 2013 WL 5464395, at *6 (N.D.N.Y. Sept. 30, 2013) ("Employer comments or actions evincing animus towards [protected activity] can create

an inference of retaliation.").  Further, Plaintiff has established a sufficient question of fact as to whether Sheriff Howard accused Plaintiff of drinking on the job as a pretext for firing him or forcing him to retire.  *See Xu-Shen Zhou v. State Univ. of New York Inst. of Tech.,* 499 F. App'x 105, 108-10 (2d Cir. 2012) (reversing judgment for defendants based on evidence of the falsity of defendants' termination explanations); *Kessler*, 461 F.3d at 211 (same).  Indeed, Plaintiff sufficiently pleads disparate treatment of himself and two others accused of the same transgression in support of his pretext argument.  *See supra* n.4.  Despite being subject to the same allegations of misconduct, Marsh and Schmidt were not similarly ordered to resign or be fired, or falsely reported as having resigned during an investigation.[17]  *See* Dkt. No. 19 at 19.  In short, Plaintiff has plausibly alleged that he was treated differently with regard to pre- and post-resignation adverse consequences, and such treatment is causally related to Plaintiff's protected conduct.  *See, e.g.*, *Comerford*, 2021 WL 950974, at *24 (concluding that plaintiff raised a material issue of fact as to whether decertification of her police training was an adverse employment action).

For these reasons, the Court finds that Plaintiff has sufficiently pled a causal nexus between Plaintiff's alleged protected conduct and the adverse consequences he suffered.

## ii.  Temporal Proximity

Although Defendant's arguments concerning temporal proximity focus on Plaintiff's removal from the Registry and inability to take office as sheriff or obtain another law enforcement role, *see* Dkt. No. 16-1 at 20-21, Plaintiff alleges other adverse consequences, as well.  As with

---

[17] Defendants' arguments that these two are improper comparators, in addition to being presented without citation to legal authority, also lack basis in Plaintiff's allegations or sound reasoning. Specifically, Defendants point to the fact that Plaintiff was a superior to the other individuals.  *See* Dkt. No. 20 at 11-12.  Defendants tellingly do not argue that allegations of drinking on the job are treated differently based on the accused's role with TCSD, such that a resignation would not trigger a decertification from the Registry if they resigned following the accusation.

the subject-matter nexus between Plaintiff's alleged pre-resignation protected conduct and adverse consequences, the temporal nexus pled is clear and unimpugnable. Simply put, Plaintiff's assertions that he was directed by Sheriff Howard to stop stating that he was going to run for sheriff directly followed Plaintiff's previous statements that he was going to run for sheriff. *See supra* Sec. II.B.2; *Dushane*, 6 F. Supp. 3d at 212 ("In general, a temporal gap of less than two months is sufficient to give rise to an inference of causation.").

The allegations with respect to the temporal relationship of the additional pre-resignation conduct and adverse consequence are also sufficient. Although Defendant argues that "the misconduct allegation itself is an intervening causal event which would destroy any temporal proximity argument made by Plaintiff regarding his 2018 aspirations anyway," Dkt. No. 16-1 at 21 (citing *Mercer v. Schriro*, 337 F. Supp. 3d 109, 132 (D. Conn. 2018)), as discussed above, *see supra* Sec. IV.A.1.c.i, the Court cannot decide at this time whether the accusation was a legitimate qualm or a pretext to remove Plaintiff from Sheriff Howard's concern.

Finally, Defendants argue that Plaintiff's alleged post-resignation adverse actions— Defendants' two May 2021 letters to DCJS to have Plaintiff removed from the Registry— happened too long after any protected conduct. One way Defendants attempt to frame this argument is in terms of the investigation that was conducted following Sheriff Howard's accusations against Plaintiff, and the need to complete the investigation prior to conveying information to DCJS. *See* Dkt. No. 20 at 9 ("By the time the investigation was completed in 2021, the casual chain was broken, to the extent it can logically be argued one existed from Plaintiff's own retirement in 2020."). This argument is beset by a variety of problems. First, as pled in the Amended Complaint, there was no investigation or proceeding related to Plaintiff's alleged conduct following Sheriff Howard's accusation against Plaintiff. *See supra* Sec. II.B.2 & n.3.

Indeed, it is hard to imagine that an investigation could have occurred without Plaintiff's participation, let alone without Plaintiff having been made aware of it through formal procedures. Second, upon learning that he had been removed from the Registry, Plaintiff submitted a freedom of information request for Tioga and DCJS records concerning him. This request ostensibly would have included information concerning any proceeding or investigation, however Plaintiff did not uncover any indicia of an investigation. *See* Dkt. No. 19 at 20. Third, although Defendants assert that they waited until the completion of the investigation to inform DCJS about the outcome, the letter Defendants submitted to this Court, which they cite in support, belies this claim because there is no reference to the completion or outcome of an investigation in the submitted letter. *See* Dkt. No. 16-2. Finally, and most confoundingly, Defendants' assertions run contrary even to the statutory scheme they acknowledge and describe, whereby a public law enforcement agency is required to inform DCJS that there was an ongoing investigation or proceeding against a resigning employee *at the time of their departure*—the completion of an investigation is not a basis upon which to update DCJS. *See* Dkt. No. 16-1 at 31.

In addition, although Defendants frame the year between Plaintiff's resignation and Defendants' letters as sufficiently attenuated, doing so requires them to again make factual assertions directly contrary to the plain and well-pled allegations in the Amended Complaint. Specifically, in addition to general allegations of protected conduct in 2021,[18] Plaintiff alleged several events following his termination, including two in December of 2020—only approximately 5 months before the May 2021 letters. *Compare* Dkt. No. 20 at 8-9 ("Plaintiff … does not allege any events occurred between his own retirement and the recission of his 'good guy' letter a year

---

[18] Plaintiff repeatedly alleges engaging in protected conduct "through 2021," however he does not allege particular events where he engaged in protected conduct following the December 2020 events. *See supra* Sec. II.B.1.

later"), *with, e.g.*, Dkt. No. 16-1 at 16 (acknowledging that "Plaintiff claims first amendment activity occurred [] in December of 2020" and citing Complaint allegations concerning a Tioga County Republican Committee Christmas Dinner). Indeed, the delay in time between Plaintiff's resignation in May 2020 and Defendants' letters in May 2021 might serve as an indication of retaliatory intent rather than innocuous compliance with state law and Tioga procedure. *See* Dkt. No. 19 at 19 (noting that "[i]f Defendants were … investigating Plaintiff [when he resigned], there was no reason for them to delay informing the DCJS of the investigation, as the law and regulations specifically required them to provide that information immediately" or in January of each year). As such, the Amended Complaint sufficiently pleads temporal proximity for the post-resignation adverse actions.

Accordingly, Plaintiff has sufficiently pled facts establishing each element in each of his First Amendment claims and Defendants' Motion is denied as to such claims.[19]

### 2. Plaintiff's Fourteenth Amendment Claim

Plaintiff pleads a single cause of action for Fourteenth Amendment stigma-plus violation based on Defendants' alleged false statements resulting in loss of his good standing on the Registry, inability to obtain future work in his chosen profession, and general stigma in the community, all without due process. *See* Dkt. No. 14 at ¶¶ 156-70. Defendants argue that: (1) Plaintiff has not pled a valid property or liberty interest because he resigned from his public employment and placement on the Registry is discretionary; (2) Defendants' alleged statements were neither public nor defamatory; and (3) Plaintiff failed to take necessary steps to exhaust administrative remedies before bringing suit.

To establish a Section 1983 claim premised on a Fourteenth Amendment procedural due

---

[19] Notwithstanding Defendant-specific issues discussed below, *infra* Sec. IV.A.3.

process violation, a plaintiff must show two elements: (1) the existence of a protected interest; and (2) deprivation of that interest without due process.  *Bryant v. New York State Educ. Dep't*, 692 F.3d 202, 218 (2d Cir. 2012).  At issue here, a protected "liberty interest may arise … from an expectation or interest created by state laws or policies."  *Green v. McKoy*, No. 9:22-CV-00044 (LEK/ML), 2023 WL 2742143, at *17 (N.D.N.Y. Mar. 31, 2023) (alteration omitted) (quoting *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005)).  Notably, a benefit is not a protected interest "if government officials may grant or deny it in their discretion."  *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005) (citation omitted).

To adequately assert a stigma-plus claim, a plaintiff must "show (1) the utterance of a statement 'sufficiently derogatory to injure his or her reputation, that is capable of being proved false, and that he or she claims is false,' and (2) a material state-imposed burden or state-imposed alteration of the plaintiff's status or rights."  *Sadallah v. City of Utica*, 383 F.3d 34, 38 (2d Cir. 2004) (quoting *Doe v. Dep't of Pub. Safety ex rel. Lee*, 271 F.3d 38, 47 (2d Cir. 2001), *rev'd on other grounds*, 538 U.S. 1, 6-7 (2003)).  Put differently, "[a] plaintiff must first prove the 'stigma,' i.e., the loss of reputation, and also the 'plus,' which is some other specific liberty interest deprivation which does not flow from the injured reputation."  *Barber v. Winn*, No. 95-CV-1030 (FJS), 1997 WL 151999, at *4 (N.D.N.Y. Mar. 31, 1997), *aff'd*, 131 F.3d 130 (2d Cir. 1997) (citing *Valmonte v. Bane*, 18 F.3d 992, 1000-02 (2d Cir. 1994)).  While not required, in most instances, this element is met "by dismissal from government employment," in addition to the stigma-inducing statement.  *Dowd v. DeMarco*, 314 F. Supp. 3d 576, 586 (S.D.N.Y. 2018) (quoting *Sacco v. Pataki*, 114 F. Supp. 2d 264, 271 (S.D.N.Y. 2000), *aff'd sub nom. Abramson v. Pataki*, 278 F.3d 93 (2d Cir. 2002)).

### a.  Plaintiff's Alleged Fourteenth Amendment Stigma Plus Injuries

Defendants acknowledge that "[s]tatements which denigrate an individual's professional ability qualify as stigmatizing for the purposes of such a claim [] if those statements would serve as an effective roadblock to future employment in their chosen career."  Dkt. No. 16-1 at 25 (quoting *Donato v. Plainview-Old Bethpage Cent. Sch. Dist.*, 96 F.3d 623, 630-31 (2d Cir. 1996)). Although Defendants take issue with Plaintiff's pleadings, it is incontrovertible that Plaintiff has adequately pled both factual allegations and legal underpinnings that tie Defendants' allegedly false statements to DCJS, made for the purpose of having Plaintiff's name removed from the Registry, to Plaintiff's inability to now or in the future return to his chosen career, either as an elected sheriff or any other law enforcement role for which good standing on the Registry is a prerequisite.  *See supra* Sec. II.B.2-3.  Defendants' argument that Plaintiff can have no cognizable interest in standing on the Registry because such status is "discretionary" is belied by Defendants' own acknowledgment of the relevant law and policy framework and, specifically, the fact that status on the Registry is "nondiscretionary" under that framework.  *Compare* Dkt. No. 16-1 at 23 ("decision to issue a letter to the DCJS regarding the status of an employee's standing at the time of retirement, or a 'good guy letter,' is one made at the discretion of the Sheriff"), *with id*. at 31 ("Defendants Howard and Nalepa are not alleged to have committed any actions beyond those mandated to them by statute").  Defendants reiterate this argument on Reply without acknowledging Plaintiff's arguments in opposition.  *See* Dkt. No. 20 at 12.  Notwithstanding Defendants' failure to take a consistent position on this point, the Amended Complaint does not equivocate and alleges entitlement to Registry status where the factual basis for such is present.

Next, Defendants argue that their issuance of the May 2021 letters[20] were neither public

---

[20] Defendants frequently refer to a singular "letter," notwithstanding Plaintiff's allegations of two

nor stigmatizing because the letters were private, and nothing contained in them was untrue.  *See* Dkt. No 16-1 at 25-26.  Taking these positions in reverse, Defendants' assertion that nothing in the letters was untrue flies directly in the face of the well-pled allegations in the Amended Complaint, specifically that Plaintiff was not drinking while on duty, that Sheriff Howard's accusation was pretextual, and that no investigation took place following Sheriff Howard's accusation.[21]  *See supra* Sec. II.B.2-3.  Thus, because Defendants attempt to present and rely on more than the "facts which are essentially admitted [] in the Complaint," Dkt. No. 16-1 at 26, the Court cannot at this stage credit Defendants' claim that the contents of the letters were true.

Defendants' arguments with respect to the public nature of the claims at issue are also without merit.  Notably, for stigma-plus liability to attach, the statement must be "sufficiently derogatory to injure [a claimant's] reputation" but does not necessarily need to meet a threshold related to publication into the public domain.  *See Sadallah v. City of Utica*, 383 F.3d 34, 38 (2d Cir. 2004) (quotation omitted).  So, while Defendants are correct that their letters to DCJS were not widely distributed and the only public effect of their issuance was Plaintiff's changed status to "removal for cause [where] an employee resigne[d] or retire[d] while a disciplinary process has commenced pursuant to" law, Dkt. No. 14 at ¶ 115; Dkt. No. 16-1 at 26, the effect of such on Plaintiff's reputation, particularly when untrue, is indeed derogatory and "serve[s] as an effective roadblock to future employment in [Plaintiff's] chosen career."  *See Donato v. Plainview-Old Bethpage Cent. Sch. Dist.*, 96 F.3d 623, 630-31 (2d Cir. 1996) (finding no property interest in job

---

letters sent by Defendants.  *See* Dkt. No. 14 at ¶¶ 94-97.

[21] Defendants' assertions on this point are also contradicted by the letter they submitted in support of the Motion.  *Compare* Dkt. No. 16-1 at 26 (stating the letter included "the results of that investigation once it concluded in May of 2021 showed he did not retire in good standing"), *with* Dkt. No. 16-2 (Sheriff Howard's letter  not referring to any conclusion to an investigation or reason for letter at such time other than the stated desire to change Plaintiff's status to removal for cause).

during probationary period but finding a liberty interest where defendant's statements went "to the heart of [plaintiff's] professional competence and damage her professional reputation to such an extent as to severely impede her ability to continue in" her chosen field); *accord Huda v. N.Y.C. Health & Hosps. Corp.*, No. 19-cv-11556 (AJN), 2021 WL 1163975, at *4 (S.D.N.Y. Mar. 26, 2021) ("Placing stigmatizing charges in a discharged employee's personnel file may qualify as public dissemination because those statements are likely to be disclosed to prospective employers.") (quotation omitted).  Thus, Defendants' statements in the letters that Plaintiff was removed for cause because a disciplinary proceeding had been commenced against him at the time he resigned are sufficient to state at least an undue depravation of a liberty interest.

### b.  Plaintiff's Duty to Exhaust Administrative Remedies

Defendants' final argument is that Plaintiff failed to exhaust administrative remedies prior to bringing suit.  Where "an employee is constitutionally entitled to a pre-deprivation hearing, she may refrain from bringing an Article 78 proceeding but bring a procedural due process claim premised on the non-provision of an adequate pre-deprivation hearing."  *Dushane v. Leeds Hose Co. #1 Inc.*, 6 F. Supp. 3d 204, 214 (N.D.N.Y. 2014) (citing *Giglio v. Dunn*, 732 F.2d 1133, 1135 (2d Cir. 1984) and *Reed v. Medford Fire Dep't, Inc.*, 806 F. Supp. 2d 594, 612 (E.D.N.Y. 2011)). Further, although "[i]t is well settled that an Article 78 proceeding is an adequate remedy to challenge decisions with respect to firearms licenses[,]" *Oquendo v. City of New York*, 492 F. Supp. 3d 20, 29 (E.D.N.Y. 2020) (quotation omitted), Defendants' arguments again miss the mark by framing Plaintiff's claim as concerning a "good guy" letter entitling him to continue to carry a concealed firearm.  Plaintiff specifically did not bring a claim with respect to his right to carry a concealed firearm or a constructive termination claim—instead, Plaintiff's Amended Complaint is quite clear that the injury he alleges was the loss of Plaintiff's good standing on the Registry

without adequate pre-deprivation due process in the form of an investigation.  *See* Dkt. No. 14 at ¶¶ 164-69.  Thus, Defendants have failed to show that Plaintiff was required to pursue an Article 78 proceeding to rectify the harm to his reputation and professional prospects caused by Defendants' actions to have DCJS change Plaintiff's Registry status.  *See Reed*, 806 F. Supp. 2d at 612 (noting that "the fact that the Plaintiff contends that the ... Defendants['] actions violated the municipal law and Department by-laws does not require a finding that … Defendants['] conduct was random and unauthorized" thus requiring a post-depravation hearing); *accord Ratajack v. Brewster Fire Dep't, Inc. of the Brewster-Se. Joint Fire Dist.*, 178 F. Supp. 3d 118, 142-43 (S.D.N.Y. 2016) (observing that not all allegedly illegal firings, even when "not carried out by a 'high ranking official with final authority over significant matters'" require an Article 78 action before bringing suit, and collecting cases) (quoting *Byrne v. Ceresia*, 503 F. App'x 68, 70 (2d Cir. 2012)).  Accordingly, Plaintiff adequately pleads a Fourteenth Amendment stigma-plus due process claim and Defendant's Motion is denied as to Plaintiff's third cause of action.

### 3.   Liability of Individual Defendants Sherriff Howard and Captain Nalepa

Defendants also move to dismiss the Amended Complaint on the grounds that Plaintiff's Constitutional claims brought under Section 1983 are not properly asserted against Sheriff Howard and Captain Nalepa.  *See* Dkt. No 16-1 at 30-31.

As to Plaintiff's first cause of action, Defendants contend that "Plaintiff simply does not allege that Defendant Nalepa was personally involved in" a deprivation of his First Amendment rights.  Dkt. No. 16-1 at 31.  The allegations in the Amended Complaint involving Captain Nalepa concern Plaintiff's alleged removal from the Registry, which conduct serves as a basis of Plaintiff's First Amendment and Fourteenth Amendment claims.  *See supra* Sec. II.B.2-3; Dkt. No. 14 at ¶¶ 141-45.  Accordingly, the Motion is denied as to this cause of action against Captain Nalepa.

With respect to Plaintiff's other two Section 1983 claims—First Amendment retaliation and Fourteenth Amendment stigma-plus violation—Defendants' arguments are similarly unavailing. First, although Defendants curiously argue that Sheriff Howard "is not alleged to have sent the letter[,]" Dkt. No. 16-1 at 30, Plaintiff explicitly alleged that Sheriff Howard sent "a letter to the DCJS dated May 3, 2021," Dkt. No. 14 at ¶¶ 94-96; *see also* Dkt. No. 19 at 29. Thus, Defendants' subsequent claim that Sheriff Howard "is only claimed to have 'caused' the letter to be sent," Dkt. No. 16-1 at 30, is incorrect. Indeed, in support of the Motion, Defendants attached a letter purporting to be from Sheriff Howard that comports with the description of the substance of the letter alleged in paragraph 95 of the Amended Complaint. *Compare* Dkt. No. 16-2, *with* Dkt. No. 14 at ¶ 95. Plaintiff thus pleads Sheriff Howard's involvement in two ways—first, Sheriff Howard himself sent a letter containing false statement, and second, Sheriff Howard used his authority to direct a subordinate, Captain Nalepa, to send a letter containing false statement. *See id.* at ¶¶ 94-101. Second, Defendants take issue with the *Monell* claim predicated on Captain Nalepa's conduct because "his only action [wa]s issuing a letter after the conclusion of an investigation[.]" Dkt. No. 16-1 at 30. Defendants cite no support or authority whatsoever for the argument implied in this statement: that issuing a letter to DCSJ to have them alter Plaintiff's status on the Registry is an insufficient basis to find *Monell* liability as to the municipal employer of the letter-sender.[22] To the contrary, Plaintiff alleges and Defendants acknowledge that Sheriff Howard and Captain Nalepa[23] were acting pursuant to state laws and policies of Tioga and TCSD in sending

---

[22] Indeed, in the face of Plaintiff's Opposition arguments, *see* Dkt. No. 19 at 28-30, Defendants are completely silent as to Plaintiff's *Monell* liability claim on Reply. *See generally* Dkt. No. 20.

[23] Defendants do not appear to contend that Plaintiff's allegations with respect to Captain Nalepa are conclusory, but merely assert that "his only action is issuing a letter after the conclusion of an investigation." Dkt. No. 16-1 at 30. Notably, nothing in the Amended Complaint, nor even in the letter submitted by Defendants in support of the Motion, indicates that the letters were sent following an investigation, or that an investigation or proceeding concluded, let alone occurred.

their letters to cause a Registry update.  *See* Dkt. No. 16-1 at 31.

Accordingly, the Court finds that Plaintiff sufficiently alleges the individual involvement of Sheriff Howard, both based on his role as a supervisor and his direct participation, and Captain Nalepa based on his direct participation, and Defendants' Motion as to these grounds is denied.

### B.  Plaintiff's Claims for *Monell* Liability as to Tioga and TCSD

Defendants move to dismiss Plaintiff's *Monell* liability claims on the ground that they are implausibly stated in conclusory terms.  *See* Dkt. No. 16-1 at 29-30.

To establish liability against a municipality under Section 1983 based on acts of a public official, a plaintiff is required to show: "(1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury."  *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008) (citing *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690-91 (1978)).  "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law."  *Friend v. Gasparino*, 61 F.4th 77, 93 (2d Cir. 2023) (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011)). "However, a 'municipal policy may be pronounced or tacit and reflected in either action or inaction.'"  *Carter v. Broome Cnty.*, 394 F. Supp. 3d 228, 241 (N.D.N.Y. 2019) (quoting *Cash v. Cnty. of Erie*, 654 F.3d 324, 334 (2d Cir. 2011)); *see also Benacquista v. Spratt*, 217 F. Supp. 3d 588, 600 (N.D.N.Y. 2016) (a plaintiff "must allege facts tending to support, at least circumstantially, an inference that such a municipal policy or custom exists") (quoting *Santos v. New York City*, 847 F.Supp.2d 573, 576 (S.D.N.Y. 2012)).

---

*Cf.* Dkt. No 16-1 at 11 (asserting without support and contrary to the allegations in the Amended Complaint that "Defendants found that aside from drinking alcohol while on duty, Plaintiff committed a number of acts of financial impropriety and other instances of misconduct.").

### 1. Plaintiff's Claims for *Monell* Liability as to TCSD

As an initial matter, the Court must address Plaintiff's claims against TCSD. Notwithstanding Defendants' silence on the issue, *see* Dkt. No. 16-1 at 29-30, "a municipal police department ... is neither a person nor a municipality for purposes of § 1983 analysis." *Perri v. Bloomberg*, No. 06 CV 403 (CBA) (LB), 2006 WL 8439302, at *2 (E.D.N.Y. Sept. 25, 2006) (collecting cases). Plaintiff alleges that TCSD is "a department and agency" of Tioga, not an independent municipal corporation like Tioga. Dkt. No 14 at ¶ 9. Accordingly, each of Plaintiff's constitutional claims against TCSD are dismissed on the ground that TCSD is not a proper Section 1983 defendant. *See Zavalidroga v. Oneida Cnty. Sherif's Dep't*, No. 6:11-CV-277 (NAM/DEP), 2012 WL 1068844, at *12 (N.D.N.Y. Mar. 29, 2012) (dismissing "all claims against the Oneida County Sheriff's Department ... on the ground that they are not proper defendants").

### 2. Plaintiff's Claims for *Monell* Liability as to Tioga

Plaintiff alleges that Sheriff Howard, in his official capacity with final policy-making authority for Tioga, acted under the color of law to send a letter to DCJS and to cause Captain Nalepa to send a second letter to DCJS containing false statements for the purpose of having DCJS publish false information about Plaintiff to the public concerning his resignation and removing Plaintiff's ability to work again in law enforcement. *See* Dkt. No. 19 at 28-29. Further, Plaintiff alleges that Tioga was deliberately indifferent to Plaintiff's constitutional rights by failing to train Sheriff Howard and Captain Nalepa to not violate Plaintiff's rights and failed to have their injurious statements retracted or withdrawn when Plaintiff raised the issue. *See id*. at 29-30.

Defendants rehash the arguments made as to Sheriff Howard's and Captain Nalepa's personal involvement in the alleged constitutional violations, and these arguments fail for the same reasons. As noted above, Defendants acknowledge that Sheriff Howard and Captain Nalepa sent

their letters pursuant to state law and Tioga and TCSD policies.  *See* Dkt. No. 16-1 at 31.  *Cf.*
*Comerford v. Vill. of N. Syracuse*, No. 5:18-cv-1143 (BKS/TWD), 2021 WL 950974, at *24
(N.D.N.Y. Mar. 12, 2021) (concluding that plaintiff "raised a material issue of fact as to whether
decertification of her police training … was an adverse employment action"); *Dzwonczyk v.*
*Syracuse City Police Dep't*, 710 F. Supp. 2d 248, 271 (N.D.N.Y. 2008) (finding *Monell* liability
claims predicated on the role of the chief of police adequately pled).  As such, Defendants' Motion
is properly denied as to Plaintiff's *Monell* liability claims against Tioga.[24]  *See, e.g.*, *Jeffes v.*
*Barnes*, 208 F.3d 49, 61 (2d Cir. 2000) (finding municipality because county sheriff "was, as a
matter of law, the County's final policymaking official with respect to the conduct of his staff
members toward fellow officers who exercise their First Amendment rights to speak publicly");
*Benacquista*, 217 F. Supp. 3d at 601 (finding plaintiff "sufficiently pleaded a failure-to-act-or-
supervise *Monell* claim to survive dismissal" where plaintiff "allege[d] that the District's
policymaking officials failed to take any meaningful corrective or preventive action").

### C.  Plaintiff's Claims for Defamation

Plaintiff alleges two causes of action based on defamation, common law defamation and
defamation *per se*.  Dkt. No. 14 at ¶¶ 171-91.  Defendants move to dismiss Plaintiff's defamation
claims on the grounds that he insufficiently pled a false defamatory statement by Defendants as
well as any negative effects on Plaintiff's employment prospects.  *See* Dkt No. 16-1 at 28-29.

To state a claim for defamation, a plaintiff must allege "(1) a false and defamatory
statement of fact, (2) regarding plaintiff, (3) the publication of the written or oral statements to a

---

[24] Nonetheless, Plaintiff's separate claim for *Monell* liability is dismissed as duplicative of his
three Section 1983 claims.  *See Benacquista*, 217 F. Supp. 3d at 599 ("*Monell* does not provide a
separate cause of action against a municipal entity; rather, 'it extends liability to a municipal
organization where that organization's [policy, practice, or custom] led to an independent
constitutional violation.'") (quoting *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006)).

third party, and (4) injury to the plaintiff." *Parent v. New York*, 786 F. Supp. 2d 516, 540 (N.D.N.Y. 2011), *aff'd*, 485 F. App'x 500 (2d Cir. 2012) (quoting *Ives v. Guilford Mills, Inc.,* 3 F. Supp. 2d 191, 199 (N.D.N.Y. 1998)).  "Additionally, an otherwise actionable statement may not be actionable if subject to a qualified privilege." *Ratajack*, 178 F. Supp. 3d at 158 (citing *Colantonio v. Mercy Med. Ctr.*, 135 A.D.3d 686, 691 (2d Dep't 2016)).  However a "defendant forfeits this qualified privilege by making a false, defamatory statement with 'malice ….'" *Albert v. Loksen*, 239 F.3d 256, 272 (2d Cir. 2001).  With respect to the injury, courts in New York require that "it must either cause special harm or constitute defamation *per se*." *Peters v. Baldwin Union Free Sch. Dist.*, 320 F.3d 164, 169 (2d Cir. 2003) (quoting *Dillon v. City of New York,* 261 A.D.2d 34, 38 (1st Dep't 1999)).  "A statement is defamatory *per se* if it asserts that the plaintiff committed a serious crime or tends to injure the plaintiff in his trade, business or profession." *Rissetto v. Clinton Essex Warren Washington Bd. of Coop. Educ. Servs.*, No. 8:15-CV-720 (CFH), 2018 WL 3579862, at *8 (N.D.N.Y. July 25, 2018) (quoting *Peters*, 320 F.3d at 169).  Finally, "[t]o be actionable the statement must do more than cause discomfort or affront; the statement is not measured by the sensitivities of the maligned, but the critique of reasonable minds that would think the speech attributes odious or despicable characterizations to its subject." *Jeanty v. Cerminaro*, No. 21-1974-cv, 2023 WL 325012, at *7 (2d Cir. Jan. 20, 2023) (alteration omitted) (quoting *Chau v. Lewis*, 771 F.3d 118, 127 (2d Cir. 2014)).

### 1.  Plaintiff's Common Law Defamation Cause of Action

Plaintiff has established each of the elements of his *prima facie* defamation claim.  First, Plaintiff has alleged that Defendants, by and through Sheriff Howard and Captain Nalepa, sent letters containing false and defamatory information, and that the information was about Plaintiff. *See* Dkt. No. 19 at 26.  Next, Plaintiff alleges that the statements were published to a third party to

the extent that they were submitted to DCJS, a separate entity from Defendants, and that the submission was done for the purpose of having the information submitted to DCJS automatically published to the public—via the Registry and Decertification List.  *See id*. & n.4.  Finally, Plaintiff alleges that he suffered injury as a result of Defendants' statements, *see id*., which assertion is the primary target of the Motion.

In the Motion, Defendants argue that Plaintiff's state law defamation claim must be dismissed because Plaintiff fails to allege special damages.  Dkt. No 16-1 at 28 & n.6.  In response, Plaintiff notes that the Amended Complaint "asserts that Plaintiff was injured by [Defendants'] statements."  *Id*. (citing Dkt. No. 14 at ¶¶ 117, 145, 155, 161, 170, 187, 200).  The Court disagrees with Defendants that "Plaintiff fails to sufficiently allege [that] he suffered economic or pecuniary harm."  Dkt. No. 16-1 at 29.  Rather, the Court understands Plaintiff's alleged special damages to include that Defendants' actions "impugn[ed] Plaintiff's reputation and standing in his career and in the community by falsely claiming that Plaintiff was subject to a disciplinary proceeding … and that he was incompetent and/or engaged in misconduct," Dkt. No. 14  at ¶ 184, "harmed Plaintiff's reputation and standing in his career and in the community, [] caused him economic harm, [] caused him to incur special damages in the form of actual pecuniary loss, including lost income, benefits, job security and opportunities for career advancement, and [] caused him embarrassment, humiliation, and emotional injury," *id*. at ¶ 187.[25]

Thus, the Court finds that Plaintiff has adequately alleged special harm or damages flowing out of Defendants' conduct sufficient for this claim to survive a motion to dismiss.  *See Boushie v. U.S. Investigations Serv., LLC*, No. 06-CV-1289, 2007 WL 607394, at *4 (N.D.N.Y. Feb. 20,

---

[25] Defendants do not address this argument on Reply, and in fact are wholly silent on Plaintiff's defamation claims on Reply.  *See generally* Dkt. No. 20.

2007) (declining to dismiss defamation claims where the "Plaintiff identifies specific, injurious, false statements made by the named defendants and publication of these statements to third parties without privilege or authorization").

### 2. Plaintiff's Defamation *Per Se* Cause of Action

Defendants' arguments as to Plaintiff's defamation *per se* cause of action suffer from a confusion of the applicable legal standards. Notably, Defendants argue that "Plaintiff fails to sufficiently allege *per se* defamation as he does not allege he suffered economic or pecuniary harm," Dkt. No. 16-1 at 29, despite having previously acknowledged that only "non *per se* defamation" claims require a plaintiff to "allege special damages, meaning the loss of something economic or pecuniary." *Id.* at 28. Indeed, as Defendants acknowledge, defamation *per se* can include "false statements which impugn an individual's profession or trade." Dkt. No. 16-1 at 28. Thus, Plaintiff has established a *prima facie* case for defamation *per se* against Defendants. *See Am. Med. Ass'n v. United Healthcare Corp.*, No. 00 CIV. 2800 (LMM), 2001 WL 863561, at *17 (S.D.N.Y. July 31, 2001) ("when [a] publication contains an insinuation that [a] dismissal was for some misconduct … it becomes defamatory") (quoting *Lian v. Sedgwick James*, 992 F. Supp. 644, 649 (S.D.N.Y. 1998)).

Defendants make two additional arguments with respect to the defamation *per se* cause of action.[26] First, Defendants argue that Plaintiff could not identify lost job opportunities, such as a

---

[26] Defendants also have a third argument, framed in terms of refuting a claim for libel contained in Plaintiff's defamation allegations. Defendants argue that they cannot be liable for libel because the two May 2021 letters sent by Defendants to DCJS were shared within the "common interest privilege." *See* Dkt. No. 16-1 at 28 n.5. While Defendants are correct about the existence of such a privilege, the established privilege is qualified, and such qualification fails where a defendant acted with actual malice. *See Goldstein v. Cogswell*, No. 85 CIV. 9256 (KMW), 1992 WL 131723, at *22 (S.D.N.Y. June 1, 1992) ("Even if these privileges are otherwise applicable, they will fail if the defendant acts with malice."). As Plaintiff has adequately pled malice with respect to the publication of known false statements and failure to correct such statements, the Court cannot

rejected application, and that Plaintiff no longer had a profession or trade to injure because he had retired in May 2020.  *See* Dkt. No. 16-1 at 29 (citing *Sadowy v. Sony Corp. of Am.*, 496 F. Supp. 1071, 1077 (S.D.N.Y. 1980)).  In response, Plaintiff asserts that he remained committed to pursuing the role of sheriff, and that having retired is not a permanent prohibition on seeking future employment.  *See* Dkt. No. 19 at 27 & n.5.  The Court agrees with Plaintiff that resigning from a position—even when framed as a "retirement"—is not preclusive to seeking future employment.

Second, Defendants argue that Plaintiff's claims are inadequately pled because the statement was only "made on one occasion to a specific agency" and thus cannot meet "New York's single instance rule[.]"  Dkt. No. 16-1 at 29.  This argument fails because, as Plaintiff and Defendants' own cited authority notes, the "single instance rule" blocks defamation liability for statements about a single instance of conduct, but not where the one alleged statement[27] goes more broadly to an employee's skill or aptitude in their profession.  *See Sadowy*, 496 F. Supp. at 1078 (declining to apply the 'single instance' rule where defendant's "remark smacks more of reporting a characteristic of the plaintiff, i.e., that he is professionally unreliable or irresponsible, than of reporting one single act or omission which in some way reflects badly on his professional competence").  Because "Defendants' statements alleged misconduct and incompetence without narrowing the allegations to a single instance[,]" Dkt. No. 19 at 27, Plaintiff's defamation *per se* cause of action properly survives the Motion as well.

---

credit Defendant's common interest privilege argument.  *See Boyd v. Nationwide Mut. Ins. Co.*, 208 F.3d 406, 411 (2d Cir. 2000) (reversing summary judgment for defendant because "[a]n employer cannot use the qualified privilege to prevent a defamed employee from using the litigation process to seek evidence of the employer's bad faith where the employer controlled all relevant information yet failed to consult it before making unfounded accusations").

[27] As noted above, Plaintiff has alleged two instances of defamatory speech—each of the two May 2021 letters sent by Defendants—and further alleged continuing defamatory harm in the form of Plaintiff's status on the Decertification List, which Defendants caused and declined to correct.

### D.  Plaintiff's Claims for *Respondeat Superior* Liability as to Tioga and TCSD

Finally, Defendants move to dismiss Plaintiff's *respondeat superior* liability claim as to Tioga and TCSD as improperly asserted.  *See* Dkt. No. 16-1 at 30.  As an initial matter, Plaintiffs cannot plead *respondeat superior* liability as to municipal defendants Tioga and TCSD because, as discussed above, the proper method for asserting municipal liability for civil rights violations is through a *Monell* claim.  *See Cash v. Cnty. of Erie*, 654 F.3d 324, 333 (2d Cir. 2011) ("municipalities are 'responsible only for their own illegal acts,' and cannot be held 'vicariously liable under § 1983 for their employees' actions.'") (quoting *Connick v. Thompson*, 563 U.S. 51, 60 (2011)).  Plaintiff's tort claims as to both municipal Defendants—as opposed to the constitutional claims which are maintained against Tioga pursuant to *Monell* liability—cannot survive on a theory of *respondeat superior* liability.[28]  *See Hogan v. Buttofocco*, No. 1:07-CV-731 (NAM/DRH), 2009 WL 3165765, at *11 (N.D.N.Y. Sept. 28, 2009) ("under § 1983, a municipality may not be held liable for the acts of its employees based solely on a theory of *respondeat superior*") (citing *Monell*, 436 U.S. at 690-91), *aff'd*, 379 F. App'x 35 (2d Cir. 2010).  Therefore, Plaintiff's *respondeat superior* cause of action is dismissed.

## V.      CONCLUSION

Accordingly, the Court hereby

---

[28] Plaintiff's three-sentence argument in support of his *respondeat superior* liability claims do little more than restate the allegations underlying the claims, but do not cite any authority or support for maintaining municipal liability under a *respondeat superior* theory in addition to *Monell* liability.  To the extent that Plaintiff brings his *respondeat superior* claim in order to hold Tioga liable for Sheriff Howard's and Captain Nalepa's alleged defamation, *see* Dkt. No. 14 at ¶¶ 207-09, the proper avenue to do so is Plaintiff's Fourteenth Amendment claim.  *See Dowd v. DeMarco*, 314 F. Supp. 3d 576, 586 (S.D.N.Y. 2018) (determining that "defamation alone 'is simply not enough to support a cognizable liberty interest,' … [h]owever, some plaintiffs may proceed pursuant to the 'stigma plus doctrine, which in limited circumstances provides a remedy for government defamation under federal constitutional law'") (quoting *Valmonte v. Bane*, 18 F.3d 992, 1001 (2d Cir. 1994) and *Sadallah v. City of Utica*, 383 F.3d 34, 38 (2d Cir. 2004), respectively).

**ORDERS** that Defendants' Motion to dismiss Plaintiff's Amended Complaint, Dkt. No. 16, is **GRANTED in part and DENIED in part**; and the Court further

**ORDERS** that Defendants' Motion is **GRANTED** as to Plaintiff's fourth cause of action for *Monell* liability, Plaintiff's fifth and sixth causes of action for defamation against Tioga, Plaintiff's seventh cause of action for *respondeat superior* liability, and all of Plaintiff's causes of action against TCSD, which are **DISMISSED**, and Defendants' Motion is **DENIED** as to Plaintiff's remaining claims; and the Court further

**ORDERS** that Defendants file their answer(s) to Plaintiff's Amended Complaint within **FOURTEEN (14) DAYS** of the date of this Memorandum-Decision and Order pursuant to Fed. R. Civ. P. 12(a)(4)(A); and the Court further

**ORDERS** that the Clerk remove Defendant TCSD from the case; and the Court further

**ORDERS** that the Clerk serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated:   July 19, 2023
          Albany, New York

Anne M. Nardacci
U.S. District Judge