**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

WAYNE T. MOULTON,

                Plaintiff,

     v.                                        3:22-cv-00340 (AMN/ML)

COUNTY OF TIOGA, NEW YORK; GARY W HOWARD, *individually and in his capacity as Sheriff of Tioga County*; & SHAWN J. NALEPA, *individually and in his capacity as Tioga County Sheriff's Department Captain of Operations*,

                Defendant.

| APPEARANCES: | OF COUNSEL: |
|---|---|
| **SATTER RUHLEN LAW FIRM, PLLC**<br>217 South Salina Street<br>6th Floor<br>Syracuse, New York 13202<br>*Attorneys for Plaintiff* | **SARAH E. RUHLEN, ESQ.** |
| **HANCOCK EASTABROOK, LLP**<br>1800 AXA Tower I<br>Syracuse, New York 13202<br>*Attorneys for Defendants* | **FRANK W. MILLER, ESQ.**<br>**GIANCARLO FACCIPONTE, ESQ.** |

**Hon. Anne M. Nardacci, United States District Judge:**

## MEMORANDUM-DECISION AND ORDER

### I.    INTRODUCTION

On April 11, 2022, Plaintiff Wayne Moulton ("Plaintiff") commenced this action against the County of Tioga, New York, Gary W. Howard, individually and in his capacity as Sheriff of Tioga County, Shawn J. Nalepa, individually and in his capacity as Tioga County Sheriff's Department Captain of Operations (collectively, "Defendants"), as well as the Tioga County Sheriff's Department ("TCSD"), alleging violations of his constitutional and common law rights.

*See* Dkt. No. 1.  On June 22, 2022, Plaintiff amended the complaint with permission of the Court, *see* Dkt. No. 14 ("Amended Complaint"), which Defendants and TCSD moved to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure on July 6, 2022, *see* Dkt. No. 16.  On July 29, 2023, the Court issued a Memorandum-Decision and Order granting in part and denying in part the motion to dismiss which, *inter alia*, dismissed TCSD, which was originally named as a defendant.  *See* Dkt. No. 22.  Defendants answered the Amended Complaint on August 2, 2023, asserting various affirmative defenses, *see* Dkt. No. 25, which they amended with permission of the Court on September 22, 2023, *see* Dkt. No. 33.

Presently before the Court is Defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Rule 56"), seeking dismissal of the Amended Complaint in its entirety.  *See* Dkt. Nos. 52, 54 ("Motion").  Plaintiff opposes the Motion, *see* Dkt. No. 55, and Defendants filed a reply in support of the Motion, *see* Dkt. No. 56 ("Reply").  For the reasons set forth below, the Motion is granted in part and denied in part.

## II.    BACKGROUND

### A.  The Parties

Plaintiff was hired by TCSD as a corrections officer in 1991, and subsequently began working as a deputy sheriff with the department in 1996.  *See* Dkt. No. 55-1 at ¶¶ 1, 2.  Over the course of his career with TCSD, Plaintiff was promoted several times, with his final promotion to Undersheriff occurring in May 2019.  *See id.* at ¶¶ 2, 89.  Plaintiff ultimately resigned from TCSD effective May 18, 2020.  *See id.* at ¶ 80.

Defendant County of Tioga, New York ("Tioga") is a municipal corporation duly organized and existing under the laws of the State of New York.  *See* Dkt. No. 33 at ¶ 1.  Tioga maintains TCSD, which acts as Tioga's agent and for which Tioga is ultimately responsible.  *See id.* at ¶¶ 1, 9.  Defendant Sheriff Gary W. Howard ("Sheriff Howard") serves as the elected Tioga

County Sheriff, a position he has held since 1998. *See* Dkt. No. 55-1 at ¶ 6. Defendant Captain

Shawn J. Nalepa ("Captain Nalepa") served as TCSD Captain of Operations, subordinate to Sheriff

Howard. *See id.* at ¶¶ 17, 208; *see also* Dkt. No. 54 at 7, 30-31.[1]

### B. Plaintiff's Desire to Run for Sheriff

Since at least 1996, Plaintiff had expressed a general desire to run a campaign to be elected

Tioga County Sheriff upon Sheriff Howard's retirement. *See* Dkt. No. 54 at 9. The Parties agree

that, in 2019, Plaintiff began to make speeches and engage in private conversations regarding his

intent to run for that position, since Plaintiff's understanding was that Sheriff Howard would not

seek reelection following the end of his term in 2019. *See id.* at 10-11; *see also* Dkt. No. 55-1 at

¶¶ 4, 10-14, 22. The extent and nature of these speeches and conversations is disputed, but it is

acknowledged that Plaintiff made speeches to at least the Tioga Rotary Club and at a "Leadership

Tioga" event in 2019 regarding his potential campaign. *See* Dkt. No. 55-1 at ¶¶ 4-5, 12-14. Apart

from these speeches and ongoing conversations, Plaintiff did not engage in any other activity

furthering a political campaign (*e.g.*, collecting signatures, gathering funding or donations, or

creating written campaign materials). *See id.* at ¶¶ 9, 15-17. Since Sheriff Howard opted to run

for reelection in 2019, Plaintiff decided against running for Tioga County Sheriff, and instead

accepted a position as Sheriff Howard's Undersheriff. *See id.* at ¶¶ 6, 31; *see also* Dkt. No. 54 at

27.[2]

---

[1] Citations to docket entries utilize the pagination generated by CM/ECF, the Court's electronic filing system, and not the documents' internal pagination.

[2] Plaintiff alleges that his promotion to Undersheriff followed a request by Sheriff Howard that Plaintiff cease discussions regarding his intent to run for Tioga County Sheriff. "When Plaintiff offered to retire rather than stop talking about his political aspirations, Howard offered Plaintiff the Undersheriff position." Dkt. No. 55-1 at ¶ 185. Defendants contest that the Undersheriff promotion was connected to a request that Plaintiff cease engaging in political activity. *See* Dkt. No. 54 at 10.

### C.  Plaintiff's May 2020 Resignation

Plaintiff resigned from TCSD, effective on May 18, 2020, following allegations that he had been drinking on the job two weeks prior with colleagues Lieutenant Nathaniel Marsh ("Marsh") and Senior Investigator Timothy Schmidt ("Schmidt").  *See* Dkt. No. 54 at 14.  The circumstances surrounding Plaintiff's resignation, and the allegation that he was drinking on the job, are hotly contested.  Plaintiff denies drinking on the job at any point and argues that Defendants failed to produce in discovery any evidence to support that allegation.  *See* Dkt. No. 55 at 17.  Plaintiff alleges that he was denied an opportunity to defend himself against the allegations, and that Sheriff Howard told Plaintiff to "[r]etire now or you are fired."  *See* Dkt. No. 14 at ¶¶ 67-68, 70-71.  Defendants agree that Sheriff Howard made this ultimatum to Plaintiff upon his being informed of the allegations, *see* Dkt. No. 55-1 at ¶ 66, but otherwise deny that Plaintiff's choice to retire was anything other than voluntary, *see* Dkt. No. 54 at 13-14.  The Parties disagree as to whether any investigation took place into the validity of the drinking incident allegations and whether Plaintiff was subjected to any disciplinary proceeding prior to Plaintiff's retirement.  *See* Dkt. No. 55-1 at ¶ 67.  Plaintiff asserts that this series of events was a fabricated effort to force him out of TCSD as a result of his stated interest in running for Tioga County Sheriff.  *See* Dkt. No. 55 at 13 ("Defendants' actions prior to and following the alleged drinking incident show that they would *not* have taken the same action but for Plaintiff's protected activity.") (emphasis in original).

After Plaintiff left TCSD on May 4, 2020, Plaintiff filed his retirement paperwork with the Department of Criminal Justice Services ("DCJS"), which contemporaneously updated his status on the New York State Central Registry of Police and Peace officers ("Registry"), which is maintained by DCJS.  *See* Dkt. No. 52-9 (confirming that Plaintiff's Registry status through at least May 2021 was "retired").  With regard to Marsh, who is now deceased, the Parties agree that

he was subjected to a disciplinary proceeding as a result of the drinking allegations and that he resigned before that proceeding concluded.  *See* Dkt. No. 55-1 at ¶ 147.  It also appears Marsh was not given the same ultimatum that was given to Plaintiff but was instead told to either resign or be demoted.  *See id.*; *see also* Dkt. No. 52-3 (Hallett Affidavit) at 28.  Marsh did not submit his retirement paperwork to DCJS prior to his death, and the record does not appear to show that Marsh was subjected to any post-retirement investigation.  *See id.* at ¶ 150.  With regard to Schmidt, he was not given any ultimatum (in part, Defendants contend, due to Schmidt not yet being at retirement age, *see* Dkt. No. 54 at 15) but was instead temporarily demoted after admitting to drinking alcohol at lunch when questioned by Sheriff Howard.  *See* Dkt. No 55-1 at ¶ 55; *see also* Dkt. No. 52-4 (Schmidt Affidavit).

### D.  Alteration of Plaintiff's Registry Status

Following Plaintiff's May 2020 retirement, Officer Richard Hallett ("Hallett") was promoted to the position of Undersheriff.  *See* Dkt. No. 55-1 at ¶ 82.  In that position, Sheriff Howard "personally [] tasked [Hallett] with investigating other misconduct by Plaintiff aside from that on May 1, 2020."  *See id.* at ¶ 97.  Defendants allege that at some time between Plaintiff's retirement and May 2021, Hallett uncovered "several issues amounting to incompetence and misconduct by Plaintiff, including but not limited to drinking 25-30 times on duty and while driving, spending administrative funds giving exclusive workplace benefits to friends, engaging in contracts based on his personal whims, failing to properly execute his duties, and other issues." Dkt. No. 54 at 18; *see also* Dkt. No. 55-1 at ¶ 106.

In or around May 2021, after Sheriff Howard became aware of the additional allegations arising from Hallett's investigation, Sheriff Howard tasked Captain Nalepa with contacting DCJS to modify Plaintiff's Registry status from "retired" to "removal for cause" so that Plaintiff's status would reflect his alleged "incompetence and misconduct."  *See* Dkt. No 55-1 at ¶ 113.  Captain

Nalepa did so, engaging in multiple conversations with DCJS officials regarding the procedure by which to modify Plaintiff's status, and ultimately transmitting an official letter—signed by Sheriff Howard—requesting that Plaintiff's retirement status be changed. *See id.* at ¶¶ 118-21, 130. It is undisputed that Plaintiff's retirement status was changed to "removal for cause due to incompetence or misconduct" because of the May 2021 letter.

As a result of this status change, Plaintiff's basic training certification was revoked pursuant to 9 N.Y.C.R.R. § 6056.2(g)(2). *See id.* at ¶ 132. Defendants do not take a position on the practical effect such revocation had on Plaintiff, but Plaintiff contends that the change in retirement status destroyed his future prospects in law enforcement and made it impossible for him to hold the position of Sheriff. *See* Dkt. No. 55 at 11.

### E. Appeal of the Registry Status Alteration

Pursuant to 9 N.Y.C.R.R § 6056.7, Plaintiff was entitled to report a material inaccuracy regarding his Registry status. The Parties dispute whether Plaintiff filed such a report. *See* Dkt. No. 55-1 at ¶ 167. Defendants contend that no such report was filed, but Plaintiff maintains that on August 2, 2021, he filed a Statement of Law and Facts with the County, contesting the statements made in the May 2021 DCJS correspondence. *See id.* at ¶ 215. According to Plaintiff, the County took no action in response to that report. *See id.* ¶ 216.

## III. STANDARD OF REVIEW

Summary judgment is properly granted only if, upon reviewing the evidence in the light most favorable to the nonmovant, there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Richardson v. Selsky*, 5 F.3d 616, 621 (2d Cir. 1993). A court first determines "whether the evidence presents a sufficient disagreement to require submission to a [factfinder] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*

*v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52 (1986). "When analyzing a summary judgment motion, the court 'cannot try issues of fact; it can only determine whether there are issues to be tried.'" *Galeotti v. Cianbro Corp.*, No. 5:12-cv-00900 (MAD/TWD), 2013 WL 3207312, at *4 (N.D.N.Y. June 24, 2013) (quoting *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36-37 (2d Cir. 1994)).

"The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish [their] right to judgment as a matter of law." *Rodriguez v. City of N.Y.*, 72 F.3d 1051, 1060-61 (2d Cir. 1995) (citation omitted). To determine whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *accord Gibbs-Alfano v. Burton*, 281 F.3d 12, 18 (2d Cir. 2002). A "material" fact is one that would "affect the outcome of the suit under the governing law," and a dispute about a genuine issue of material fact occurs if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord R.B. Ventures, Ltd. V. Shane*, 112 F.3d 54, 57 (2d Cir. 1997). The Court should "grant summary judgment where the nonmovant's evidence is merely colorable, conclusory, speculative or not significantly probative." *Schwimmer v. Kaladjian*, 988 F. Supp. 631, 638 (S.D.N.Y. 1997) (citing, *inter alia*, *Anderson*, 477 U.S. at 249-50).

## IV.    DISCUSSION

At the outset, the Court notes that much of the evidence cited in support of both the Motion and the opposition is deposition testimony or testimony submitted through sworn affidavits prepared for the purpose of supporting the Motion or the opposition. *See generally* Dkt. Nos. 52, 55. While this is a permissible means by which to present evidence on summary judgment, without

additional documentary evidence, there is a higher likelihood that disputed questions of fact will arise when, like here, there is competing, self-serving testimony. *See, e.g.*, *Cicio v. Lamora*, No. 9:09-CV-431 (GLS/DEP), 2010 WL 1063875, at *8 (N.D.N.Y. Feb. 24, 2010) ("Plaintiff's testimony . . . stands in contrast to the seemingly overwhelming evidence that it did not occur as he alleges. Nonetheless, the weighing of such competing evidence, no matter how weak plaintiff's claim may appear, presents a question of credibility that must be left to the trier of fact.") (citing *Griffin v. Crippen*, 193 F.3d 89, 91 (2d Cir. 1999)); *Dye v. Kopiec*, No. 16-Civ-2952, 2016 WL 7351810, at *3 (S.D.N.Y. Dec. 16, 2016) ("Defendant's declaration cannot be disregarded merely because it is self-serving. Even a self-serving affidavit can establish a genuine dispute of fact so long as the affidavit does not contradict the witness's prior testimony.") (citing, *inter alia*, *Hayes v. N.Y.C. Dep't of Corrs.*, 84 F.3d 614, 619 (2d Cir. 1996)).

## A.  First Amendment Claims[3]

To survive a summary judgment motion on a First Amendment retaliation claim, Plaintiff must first establish a *prima facie* case by "bring[ing] forth evidence showing that [1] he has engaged in protected First Amendment activity, [2] he suffered an adverse employment action, and [3] there was a causal connection between the protected activity and the adverse employment action." *Smith v. Cnty. of Suffolk*, 776 F.3d 114, 118 (2d Cir. 2015); *see also Williams v. Town of Greenburgh*, 535 F.3d 71, 76 (2d Cir. 2008) (applying same factor test where the plaintiff was a public employee bringing a Section 1983 claim based on allegations of retaliation for speech or association protected by the First Amendment). In accordance with that standard, Defendants'

---

[3] As was the case with the motion to dismiss briefing, Defendants do not appear to distinguish between Plaintiff's first and second causes of action, *see* Dkt. No. 54 at 8-16, and Plaintiff similarly addresses his First Amendment claims in unison and only in the context of retaliation, *see* Dkt. No. 55 at 9-17. Accordingly, the Court follows suit, as it did in its Memorandum-Decision and Order on Defendants' motion to dismiss. *See* Dkt. No. 22 at 11 n.7.

Motion seeks dismissal of Plaintiff's First Amendment causes of action on the grounds that: (1) Plaintiff did not engage in activity protected by the First Amendment when he expressed his intent to run for Tioga County Sheriff; (2) even if Plaintiff did engage in a protected activity, he fails to establish the existence of any adverse action Plaintiff suffered; and (3) regardless, there is no causal connection between any adverse action and any complained-of free speech. *See* Dkt. No. 54 at 9-18.

### i.    Whether Plaintiff Engaged in Protected Activity

In the Motion, Defendants argue that Plaintiff's political speeches were not protected activities because they concerned topics of only "generalized public interest," and that "no dispute of material fact exists that Plaintiff did any more than speculate with friends that one day he would like to be sheriff." Dkt. No. 54 at 10-11. While Defendants concede that Plaintiff made speeches to the Tioga County Rotary Club and at a "Leadership Tioga" event in 2019 concerning his desire to one day run for Tioga County Sheriff, they posit that many of the allegations in the Amended Complaint concerning other protected conduct were not substantiated in discovery. *Id.* at 11 ("The allegations of the Amended Complaint, upon digging below surface level, turned out to be entirely related to the single rotary club statement in 2019 and claimed conversations Plaintiff had with his buddies while drinking and attending networking and charity events."). Defendants contend that Plaintiff cannot have engaged in protected activity through political speeches primarily because "Plaintiff never once took any of the formal steps required to even begin a run for elected office in New York." *Id.* at 12.

"To determine whether or not a plaintiff's speech is protected, a court must begin by asking 'whether the employee spoke as a citizen on a matter of public concern.'" *Sousa v. Roque*, 578 F.3d 164, 169-70 (2d Cir. 2009) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)). "[W]e ask two questions to determine whether a public employee speaks as a citizen: (A) did the speech

fall outside of the employee's 'official responsibilities,' and (B) does a civilian analogue exist?" *Matthews v. City of N.Y.*, 779 F.3d 167, 173 (2d Cir. 2015) (citing *Weintraub v. Bd. of Educ. of City Sch. Dist. of City of. N.Y.*, 593 F.3d 196, 203-04 (2d Cir. 2010)). The Supreme Court has defined "a matter of public concern" as one that "relat[es] to any matter of political, social, or other concern to the community." *Connick v. Myers*, 461 U.S. 138, 146 (1983). "Whether an employee's speech addresses a matter of public concern is a question of law for the court to decide, taking into account the content, form, and context of a given statement as revealed by the whole record." *Rissetto v. Cnty. of Clinton*, No. 8:15-CV-720 (GTS/CFH), 2016 WL 4530473, at *19 (N.D.N.Y. Aug. 29, 2016) (quoting *Ruotolo v. City of N.Y.*, 514 F.3d 184, 189 (2d Cir. 2008)).

Defendants do not dispute that Plaintiff's speeches regarding his intent to run for Tioga County Sheriff outside of work were made in his capacity as a citizen. *See generally* Dkt. Nos. 54, 56. They appear to take issue only with whether Plaintiff's activity constitutes a matter of public concern. In that regard, the Court has already decided as a matter of law that, to the extent Plaintiff gave speeches directed at serving as the next elected Tioga County Sheriff, whether they were formal or informal, they concerned the public in a manner sufficient to establish a First Amendment protected activity:

> Defendants cite no authority for the proposition that certain activities, like formally announcing a candidacy or making campaign signs, are necessary to qualify as protected conduct. . . . [T]he speech at issue encompasses the entirety of Plaintiff's campaign activity, whether formal or informal, directed at serving as the next elected Tioga County Sheriff. Such speech concerns the public.

*See* Dkt. No. 22 at 14 (citing cases). At this juncture, Defendants again fail to proffer authority to the contrary, and notably do not dispute that Plaintiff made at least two speeches concerning his desire to run a campaign to be elected Tioga County Sheriff. *See* Dkt. No. 55-1 at ¶¶ 4-5, 12-13. There also appear to be questions of fact regarding whether Plaintiff gave additional, similar speeches at other community events, including to the Kiwanis Club of Owego. *See id.* at ¶¶ 10-

11.  Accordingly, based primarily on Defendants' concession that the political speeches took place, the Court's previous determination stands: Plaintiff engaged in activities protected by the First Amendment at least when he gave speeches concerning his desire to run for Sheriff to the Tioga Rotary Club and at a "Leadership Tioga" event.

### ii.    Whether Plaintiff Suffered Adverse Action

Next, Defendants contend that Plaintiff has failed to establish that he suffered adverse action as a result of his protected speech because (1) Plaintiff's voluntary resignation cannot support a claim for constructive discharge; and (2) Defendants' May 2021 correspondence with DCJS, which triggered a change in Plaintiff's Registry status, was not adverse since it was not written in reckless disregard for, or in violation of, Plaintiff's constitutional rights.  *See* Dkt. No. 54 at 13-16.

To sufficiently show adverse action "[i]n the First Amendment context . . . plaintiffs need only show that the retaliatory conduct in question would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights."  *Nixon v. Blumenthal*, 409 Fed. Appx. 391, 392 (2d Cir. 2010) (quoting *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 225 (2d Cir. 2006)) (internal citations omitted); *see also, e.g.*, *Everitt v. DeMarco*, 704 F. Supp. 2d 122, 133-34 (D. Conn. 2010) (applying *Zelnik* in summary judgment context and noting the "highly fact-specific nature of the inquiry").  "Adverse employment actions include discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand."  *Frisenda v. Inc. Vill. of Malverne*, 775 F. Supp. 2d 486, 510 (E.D.N.Y. 2011) (quoting *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999)).  "However, lesser actions may also be considered adverse employment actions."  *Id.* (internal citations omitted); *see also Phillips v. Bowen*, 278 F.3d 103, 109 (2d Cir. 2002) (citing *Bernheim v. Litt*, 79 F.3d 318, 324-25 (2d Cir. 1996)).  Even under the more vigorous standards recognized for claims involving Title VII of the Civil Rights Act of 1964, adverse actions

can be established upon a showing of "injur[y] to . . . the ability to secure future employment. . . . Thus, plaintiffs may be able to state a claim for retaliation, even though they are no longer employed by the defendant company, if, for example, the company 'blacklists' the former employee, wrongfully refuses to write a recommendation to prospective employers, or sullies the plaintiff's reputation." *Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 466 (2d Cir. 1997) (citing *Silver v. Mohasco Corp.*, 602 F.2d 1083, 1090 (2d Cir. 1979), *rev'd on other grounds*, 447 U.S. 807 (1980)).

As an initial matter, and as Defendants point out in their Reply, Plaintiff has abandoned his previous position that the May 2020 resignation from TCSD constituted constructive discharge and, thus, an adverse action. *See* Dkt. No. 55 at 16 ("what Defendants cannot seem to grasp is that the adverse action at issue involves Defendants' false statements to the DCJS regarding the circumstances of Plaintiff's separation—*not* Plaintiff's forced retirement over a year earlier.") (emphasis in original). Thus, the only remaining issue on this point is whether Defendants' May 2021 correspondence with DCJS constituted an adverse action pursuant to First Amendment standards. In that regard, the Court finds that material questions of fact exist as to whether a reasonable person would view such conduct as a deterrent to exercising their constitutional rights. On the one hand, Defendants contend that they engaged with DCJS in May 2021 for "the legitimate reason of conferring upon Plaintiff the correct status which comports with Plaintiff's own conduct." Dkt. No. 54 at 16. On the other hand, Plaintiff contends that the post-retirement investigation and corresponding May 2021 letter were fabricated and politically motivated, arguing that the letter contained "demonstrably false statement[s]" and was submitted in violation of state law, which "requires that the reason for separation be reported (1) when the separation occurs, and (2) again on January 15 of each year." Dkt. No. 55 at 16 (citing 9 N.Y.C.R.R. §§

6056.4(c); 6056.5(d)); *see also* Dkt. No. 52-10 (Moulton Deposition) ("he took me off the registry over 11 months later to harm my reputation.").  Regardless, and most notably, Defendants do not appear to dispute that the May 2021 correspondence with DCJS resulted in Plaintiff's Registry status being modified in a way that restricted Plaintiff's ability to obtain future employment as a law enforcement officer or run for public office.  *See generally* Dkt. Nos. 52, 54, 56; *see also* Dkt. No. 55-1 at ¶¶ 131-132.[4]  As the has Court already noted, "[r]emoval from the Registry has been found to create a question of fact as to whether it constitutes an adverse employment action."  Dkt. No. 22 at 20 (citing cases).  Considering that, as well as the material disputes in the record and amongst the Parties regarding (1) the truthfulness underlying the contents of the May 2021 correspondence, and (2) whether Defendants were following proper administrative procedure by submitting the letter when they did, the Court cannot find as a matter of law that the May 2021 DCJS correspondence—which could have effectively blacklisted Plaintiff from future law enforcement employment—does not constitute an adverse action.

---

[4] Instead of relying on case law interpreting adverse actions in the First Amendment context, Defendants continue to argue for dismissal because Defendants allegedly did not act "with reckless disregard for, or in violation of, Plaintiff's known constitutional rights."  Dkt. No. 54 at 16; Dkt. No. 56 at 8.  First, the single case that Defendants cite for support does not stand for the proposition that this standard applies to a finding of adverse action in a First Amendment case.  *See* Dkt No. 56 at 7 (citing *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 162 (2d Cir. 2006)).  Indeed, in *Cioffi*, the parties did not dispute that an adverse action took place and thus the court undertook no analysis in that regard.  Regardless, even if the Court utilized the standard recited by Defendants, the decision to undertake a year-long investigation into Plaintiff following his retirement and contact DCJS at the conclusion of that investigation for the sole purpose of updating Plaintiff's DCJS status, coupled with the underlying documentation suggesting that DCJS took Defendants at their word regarding the credibility of that investigation, at the very least, raises a material question of fact regarding whether Defendants acted intentionally to violate Plaintiff's constitutional rights or with reckless disregard for Plaintiff's constitutional rights.

### iii.    Whether a Causal Connection Exists Between Protected Activity and Adverse Action

Finally, Defendants argue that there was no causal connection between the political speeches and the May 2021 DCJS correspondence as a matter of law because (1) the adverse action was temporally removed from the protected activity; or (2) intervening events broke any possible causal chain.  *See* Dkt. No. 54 at 16-18.

To demonstrate a causal connection in the First Amendment context, "a plaintiff must show that the protected speech was a substantial motivating factor in the adverse employment action." *Cioffi*, 444 F.3d at 167 (internal quotation marks omitted).  A plaintiff may establish causation either (1) directly through a showing of retaliatory animus, or (2) indirectly through a showing that the protected activity was followed closely by the adverse action.  *Cobb v. Pozzi*, 363 F.3d 89, 108 (2d Cir. 2004) (internal citation omitted).  On the former, "[s]pecific proof of improper motivation is required in order for plaintiff to survive summary judgment on a First Amendment retaliation claim." *Curley v. Vill. of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001).  Specifically, "the plaintiff must proffer particularized evidence of direct or circumstantial facts . . . supporting the claim of an improper motive in order to avoid summary judgment." *Hogan v. City of N.Y.*, No. 04-CV-3298, 2007 WL 9710294, at *11 (E.D.N.Y. Mar. 12, 2007).  On the latter, indirect proof through temporal proximity generally cannot serve as proof of causation when events took place more than two to three months apart.  *See Frisenda v. Inc. Vill. of Malverne*, 775 F. Supp. 2d 486, 512 (E.D.N.Y. 2011) (citing cases).

Here, Plaintiff appears to concede that temporal proximity cannot be used as a basis to establish causation, given that the political speeches took place in 2019 (two years before the DCJS correspondence).  *See* Dkt. No. 55 at 9.  Instead, Plaintiff cites to cases in which causation was shown through evidence of retaliatory animus.  Particularly, Plaintiff argues that retaliatory animus

is shown here because (1) Defendants failed to follow proper practice and procedure in their contact with DCJS; (2) Defendants treated Plaintiff differently from similarly situated employees; and (3) Defendants' conduct with respect to Plaintiff showed an intervening pattern of antagonism. *See* Dkt. No. 55 at 15-17.

First, Plaintiff is correct that courts have historically inferred discriminatory animus at the summary judgment stage where an employer departed from its usual employment practices and procedures in dealing with a particular employee. *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 97 (2d Cir. 1999); *Stern v. Trs. of Columbia Univ. in City of N.Y.*, 131 F.3d 305, 313 (2d Cir. 1997) (analyzing the question in the more vigorous Title VII context). In that regard, the Parties dispute whether Defendants followed proper procedure when they contacted DCJS a year after Plaintiff's retirement. Plaintiff contends that, by statute, Defendants' contact with DCJS was non-discretionary and any reason for Plaintiff's separation needed to be reported immediately following Plaintiff's retirement, and any update to that reason needed to be reported on January 15 of each year thereafter. *See* Dkt. No. 55 at 16 (citing 9 N.Y.C.R.R. §§ 6056.4(c); 6056.5(d)). Defendants do not address this argument with respect to First Amendment causation but posit in another portion of the Motion that "[i]t was within Defendants discretion whether to issue the May 2021 letter, and Plaintiff was not entitled to its non-issuance by any state or federal law." Dkt. No. 54 at 19. While the Parties do not agree on whether the proper statutory procedure was followed when Defendants contacted DCJS, that question is not dispositive for purposes of inferring retaliatory animus. The question is whether Defendants departed from their *usual* practices and procedures in their treatment of *Plaintiff*. *See Norville*, 196 F.3d at 97. There does not appear to be any evidence in the record showing Defendants' prior contact with DCJS regarding any other TCSD employee. As such, a reasonable juror would be unable to decipher the nature of

Defendants' "usual" practice regarding DCJS communications such that they could then infer that the practice Defendants chose to follow with respect to Plaintiff was discriminatory. For example, even if Defendants failed to follow the statutorily mandated procedure for contacting DCJS, if they similarly failed to do so on previous occasions with respect to other employees who did not engage in protected activity, it is likely that no inference of discrimination could be made. *See, e.g.*, *Crispi v. Green Bus Line, Inc.*, No. 00-CV-7159, 2003 WL 1903264, at *9 (E.D.N.Y. Jan. 7, 2003) (finding no inference of discrimination where departure from employment practices was not coupled with a showing of disparate treatment).

With respect to treatment of similarly situated employees, "[a] plaintiff may raise []an inference [of discrimination] by showing that the employer subjected him to disparate treatment, that is, treated him less favorably than a similarly situated employee outside his protected group." *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000). "An employee is similarly situated to co-employees if they are (1) subject to the same performance evaluation and discipline standards and (2) engaged in comparable conduct." *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 493-94 (2d Cir. 2010) (internal quotation marks omitted). In the First Amendment retaliation context, "[t]he comparators must be similarly situated to the plaintiff in all material respects, which means that there must be a reasonably close resemblance of the facts and circumstances of the adverse actions across the plaintiff's and comparators' cases." *Local 3599, NYC Dep't of Environmental Protectional Tech. Pro. Employees v. City of N.Y.*, No. 23-Civ-1035, 2024 WL 966077, at *11 (S.D.N.Y. Mar. 6, 2024) (citing *Radwan v. Manuel*, 55 F.4th 101, 132 (2d Cir. 2022)).

In the instant case, Plaintiff contends that TCSD employees Marsh and Schmidt "were treated differently from Plaintiff" even though they participated in the same activity that caused Plaintiff's retirement and triggered the investigation into Plaintiff's conduct that Defendants

ultimately reported to DCJS. *See* Dkt. No. 55 at 16; *see also* Dkt. No. 55-1 at ¶ 104 (alleging that all three were accused of consuming alcohol together on May 1, 2020). The Court previously held that the Amended Complaint's allegations that "Marsh and Schmidt were not similarly ordered to resign or be fired, or falsely reported as having resigned during an investigation," were sufficient to plead a causal nexus. Dkt. No. 22 at 22. Now, on summary judgment, it appears that there is some dispute with respect to the actions taken by Defendants concerning Plaintiff, Marsh, and Schmidt following the May 1, 2020 incident. First, it is undisputed that Sheriff Howard gave Plaintiff the option to resign or be terminated following the allegations that he had been drinking on the job. *See* Dkt. No. 55-1 at ¶ 66. And while Schmidt was not given a similar ultimatum because he was not approaching retirement age, *see* Dkt. No. 54 at 15, Marsh (who was approaching retirement age) was told to resign *or be demoted*. *See id.* at ¶ 147; *see also* Dkt. No. 52-3 (Hallett Affidavit) at 28 (attesting that Marsh was given the choice to resign or be demoted). Additionally, it appears that Defendants had commenced a disciplinary process with respect to Marsh prior to Marsh's decision to resign, *see* Dkt. No. 55-1 at ¶ 147, while Plaintiff maintains he was never afforded an opportunity to participate in a disciplinary process that would have allowed him to defend against the allegations, *see* Dkt. No. 55 at 17 ("there was no disciplinary proceeding in progress when Plaintiff retired."); *see also* Dkt. No. 55-1 at ¶ 135.[5] There also does not appear to be evidence in the record that any investigation was conducted into Marsh following his retirement. As Plaintiff was not similarly given the option to be demoted, was not the subject of any ongoing disciplinary proceeding prior to retirement, and was the only individual subjected to a post-retirement investigation, a reasonable juror could infer that Plaintiff was subjected to

---

[5] The record is not clear regarding whether Schmidt was ever the subject of a disciplinary proceeding, but it does appear Schmidt was at least "interviewed regarding evidence of Plaintiff's misconduct" prior to being temporarily demoted. Dkt. No. 55-1 at ¶¶ 127, 133.

adverse action in retaliation for Plaintiff's political speeches through Defendants' differing treatment of Marsh (who did not participate in any similar protected activity, and whose Registry status was never modified). Said otherwise, a reasonable juror could infer that Marsh, who did not give political speeches or express a desire to run for Sheriff Howard's position, was treated more favorably than Plaintiff following misconduct allegations. *See Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999), *abrogated on other grounds*, 81 F.4th 242 (2d Cir. 2023) ("Summary judgment is precluded where questions regarding [ ] motive predominate in the inquiry regarding how important a role the protected speech played in the adverse [ ] decision.").[6]

Accordingly, the Court cannot find as a matter of law a lack of causal connection between Plaintiff's protected activity and the alleged adverse action. Plaintiff's *prima facie* case of First Amendment retaliation therefore survives Defendants' Motion.

### iv.    Defendants' Entitlement to a Relevant Defense

"Once the plaintiff 'makes out a *prima facie* retaliation claim, a government defendant may still receive summary judgment if it establishes its entitlement to a relevant defense.'" *Smith*, 776 F.3d at 119 (quoting *Anemone v. Metro. Transp. Auth.*, 629 F.3d 97, 114 (2d Cir. 2011)). This requires Defendants to demonstrate "by a preponderance of the evidence that [they] would have

---

[6] With regard to Plaintiff's tertiary contention that retaliatory animus can be inferred through an intervening pattern of antagonism, *see* Dkt. No. 55 at 15-17, there is not sufficient evidence in the record to show that Defendants engaged in any misconduct directed at Plaintiff following his retirement aside from the May 2021 DCJS correspondence and investigation that allegedly supported such correspondence. Indeed, it does not appear that Plaintiff had any meaningful interaction with Defendants following his retirement apart from receiving notice of his Registry status modification and his attempt to appeal that modification. *See* Dkt. No. 55-1 at ¶¶ 193-215. Apart from this single adverse action, Plaintiff has not cited anything in the record that could reasonably be interpreted to be a "pattern" of antagonism. *See Bamba v. Fenton*, 758 Fed. Appx. 8, 12 (2d Cir. 2018) (citing *Duplan v. City of N.Y.*, 888 F.3d 612, 626 (2d Cir. 2018)).

taken the same adverse [] action even in the absence of the protected conduct." *Nagle v. Marron*, 663 F.3d 100, 111-12 (2d Cir. 2011) (internal citation and quotations omitted).

Here, Defendants argue that they would have written to DCJS in the same manner even if Plaintiff had not given the political speeches. *See* Dkt. No. 54 at 23-27. Specifically, Defendants contend that "[a]bsent Plaintiff's own prior instances of drinking and incompetence in the performance of his duties, there would have been no reason for Defendants to contact DCJS[.]" Dkt. No. 54 at 26. If they are ultimately shown to be true, a reasonable juror could find that the allegations that Plaintiff was repeatedly drinking on the job or engaging in other workplace incompetence would be grounds for Defendants to notify DCJS. However, once Defendants posit a legitimate defense for their actions, Plaintiff is entitled to demonstrate that "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 221 (2d Cir. 2004). To establish pretext, Plaintiff must produce sufficient evidence to cast doubt onto Defendants' proffered reasons, "and that more likely than not retaliation for complaints of discrimination was the real reason" for the adverse employment actions. *Johnson v. Nicholson*, No. 05–CV–2740, 2007 WL 1395546, at *8 (E.D.N.Y. May 11, 2007) (internal citations omitted). Plaintiff is not required to disprove Defendants' proffered reasons altogether, however. *See Fields v. New York State Off. of Mental Retardation and Developmental Disabilities*, 115 F.3d 116, 120-21 (2d Cir. 1997) (if "a plaintiff prevails by showing that discrimination was *a* motivating factor, it can invite the jury to ignore the defendant's proffered legitimate explanation") (emphasis in original).

Here, Plaintiff argues that the decision to contact DCJS in May 2021 was pretextual since (1) there is no admissible evidence regarding the allegations that Plaintiff drank on the job; and (2) Marsh, who allegedly drank with Plaintiff but did not engage in protected activity, was not reported

to DCJS in a manner similar to Plaintiff. *See* Dkt. No. 55 at 13-15. The Court finds that there is question of fact as to whether the May 2021 DCJS correspondence was pretextual. As an initial matter, to show pretext, a plaintiff may rely on evidence that was presented to establish his *prima facie* case, as well as additional evidence such as direct or circumstantial evidence of retaliation. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99-101 (2003); *LaFond v. Gen. Physics Servs. Corp.*, 50 F.3d 165, 174 (2d Cir. 1995) ("Pretext may be demonstrated either by the presentation of additional evidence showing that 'the employer's proffered explanation is unworthy of credence,' or by reliance on the evidence comprising the *prima facie* case, without more. . . .") (internal citation and quotation omitted). Relevant here, courts have found pretext was established where other employees did not experience adverse actions despite undertaking similar misconduct. *See e.g.*, *Best Payphones, Inc. v. Dobrin*, 410 F. Supp. 3d 457, 479 (E.D.N.Y. 2019). Thus, the disparate treatment of Marsh as compared to Plaintiff discussed *supra* could lead a reasonable juror to find that the allegations in the May 2021 DCJS correspondence were motivated by discriminatory animus based on Plaintiff's political speeches expressing his intent to run for Tioga County Sheriff.

The Court is unable to conclude, as Defendants urge, that a reasonable juror would necessarily find that the May 2021 correspondence would have occurred without regard to Plaintiff's speeches, given that the Parties vehemently contest the truthfulness of the allegations contained therein. While Defendants attempt to utilize the dual motivation theory to counter that issue, maintaining that "'adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone,'" *Waters v. Melendez*, No. 15-CV-0805 (TJM/CFH), 2018 WL 3079764, at *10 (N.D.N.Y. May 18, 2018) (quoting *Jackson v. Onondaga Cnty.*, 549 F. Supp. 2d 204, 215 (N.D.N.Y. 2008)), whether there were "proper"

reasons for submitting the May 2021 letter is disputed at this stage. As the Second Circuit has

held in affirming the denial of summary judgment for a First Amendment retaliation claim, "the

evidence of record before us permits only inferences. Those inferences may be drawn in either

party's favor, and we require more than inferences." *Smith*, 776 F.3d at 125. Since the Court

cannot conclude as a matter of law that Defendants ever had a "proper" reason to write to DCJS

in May 2021, given the material dispute as to the truthfulness of the allegations lodged against

Plaintiff, it similarly cannot conclude as a matter of law that the decision to contact DCJS and alter

Plaintiff's Registry status was done for legitimate and not pretextual reasons.

Accordingly, the Motion is denied with respect to Plaintiff's First Amendment claims.

### B. Plaintiff's Fourteenth Amendment "Stigma-Plus" Claim

Defendants also move for summary judgment on Plaintiff's Fourteenth Amendment claim

on both procedural and substantive grounds. First, Defendants contend that Plaintiff did not

exhaust his administrative remedies when he failed to commence proceedings pursuant to either

CPLR Article 78 or Civil Service Law § 75 ("Section 75"). *See* Dkt. No. 54 at 18-20. Second,

Defendants argue that (1) Defendants' May 2021 letter to DCJS was not stigmatizing or public;

and (2) Plaintiff does not set forth a viable property interest of which he could have been deprived.

*See id.* at 21-23.

"A procedural due process claim is composed of two elements: (1) the existence of a

property or liberty interest that was deprived and (2) deprivation of that interest without due

process." *Bryant v. New York State Educ. Dep't*, 692 F.3d 202, 218 (2d Cir. 2012) (citing

*Narumanchi v. Bd. of Trustees*, 850 F.2d 70, 72 (2d Cir. 1988)); *see also, e.g., Pleickhardt v.

Janoski*, No. 83-CV-2314, 1989 WL 47705, at *1 (E.D.N.Y. Apr. 28, 1989) (applying same

standard to claim brought under Section 1983 in the employment context). These claims are

"precluded where the state provides constitutionally adequate procedural remedies but the

employee does not avail h[imself] of those remedies." *Dushane v. Leeds Hose Co. # £1, Inc.*, 6 F. Supp. 3d 204, 214 (N.D.N.Y. 2014) (citing *New York State Nat. Org. for Women v. Pataki*, 261 F.3d 156, 168 (2d Cir. 2001)). While Defendants contend that Plaintiff's Fourteenth Amendment claim is barred because Plaintiff failed to bring a prior Article 78 or Section 75 proceeding, the Court finds this argument unpersuasive given that Plaintiff no longer asserts that his May 2020 resignation constituted a constructive discharge. "New York provides a dismissed municipal employee with an avenue for clearing [his] name—***a proceeding challenging [his] termination*** as arbitrary and capricious and contrary to law pursuant to CPLR Article 78." *Ryan v. Carroll*, 67 F. Supp. 2d 356, 361 (S.D.N.Y. 1999) (emphasis added). Article 78 proceedings in this context typically serve as a "name clearing hearing" where a claimant alleges a wrongful discharge. *See, e.g.*, *D'Allessandro v. City of Albany*, No. 04-CV-0788 (GTE/GJD), 2008 WL 544701, at *13 (N.D.N.Y. Feb. 26, 2008) (citing cases). Similarly, with regard to Section 75, that administrative remedy is available to civil service employees pre-termination—meaning, it is a venue for civil service claimants to challenge a termination prior to the termination taking effect. *Chaffer v. Bd. of Educ. of City Sch. Dist. Of City of Long Beach*, 229 F. Supp. 2d 185, 189-90 (E.D.N.Y. 2002) (citing *Anderson v. Dolce*, 653 F. Supp. 1556, 1566 (S.D.N.Y. 1987), where the Court noted Section 75 applies in "employment deprivation cases")). As this Court already noted in its motion to dismiss opinion, Plaintiff alleges that he lacked pre-deprivation due process when he was unable to rebut the statements made by Defendants to DCJS in May 2021—which came after and is, for all relevant purposes, unrelated to his May 2020 retirement. *See* Dkt. No. 22 at 29-30 ("Plaintiff's Amended Complaint is quite clear that the injury he alleges was the loss of Plaintiff's good standing on the Registry without adequate pre-deprivation due process in the form of an investigation"). In the Motion, Defendants do not appear to contest that Plaintiff lacked the ability

to respond to the allegations outlined in the May 2021 correspondence with DCJS through an Article 78 or Section 75 proceeding, instead focusing only on Plaintiff's decision to voluntarily retire. *See* Dkt. No. 54 at 20. Therefore, the exhaustion argument is rejected.

Whether Plaintiff was entitled to a pre-deprivation hearing regarding the allegations in the May 2021 DCJS correspondence is a separate question. In the Second Circuit, courts have held that where the plaintiff alleges a deprivation pursuant to an established state procedure, "the state can predict when it will occur and is in the position to provide a pre-deprivation hearing." *Reed v. Medford Fire Dep't, Inc.*, 806 F. Supp. 2d 594, 611 (E.D.N.Y. 2011). On the other hand, "if the deprivation occurs at the hands of a government actor by way of a 'random and unauthorized act,' the constitutional protection of due process does not require a pre-deprivation hearing, and therefore no cause of action under Section 1983 exists." *Id.* (citing *Rivera-Powell v. N.Y.C. Bd. of Elections*, 470 F.3d 458, 465 (2d Cir. 2006)). Conduct cannot be considered "random and unauthorized," regardless of whether the acts are contrary to state law if: (1) "the state delegated to those actors 'the power and authority to effect the very deprivation complained of . . . [and] the concomitant duty to initiate the procedural safeguards set up by state law[,]'" *id.* (quoting *Zinermon v. Burch*, 494 U.S. 113, 138 (1990)), or (2) the deprivation resulted from "the acts of high-ranking officials who are 'ultimate decision-maker[s]' and have 'final authority over significant matters[,]'" *id.* (quoting *Velez v. Levy*, 401 F.3d 75, 91-92 & nn.14 & 15 (2d Cir. 2005)). Here, under this standard, a reasonable juror could very well find that a pre-deprivation hearing was required. Indeed, Defendants have already conceded as a general matter that DCJS updates are mandated under state law. *See* Dkt. No. 22 at 33-34 ("Defendants acknowledge that Sheriff Howard and Captain Nalepa sent their letter[] pursuant to state law and Tioga and TCSD Policies.") (citing Dkt. No. 16-1 at 31). Therefore, at the very least, the Court finds that there are

23

material questions of fact regarding the procedural deficiencies alleged by Defendants and thus summary judgment on Plaintiff's stigma-plus claim is not appropriate on this ground.

With regard to Defendants' substantive arguments, to successfully establish a stigma-plus claim, "a plaintiff must show (1) the utterance of a statement 'sufficiently derogatory to injure his or her reputation, that is capable of being proved false, and that he or she claims is false,'" (*i.e.*, "stigma") ***plus*** "(2) a material state-imposed burden or state-imposed alteration of the plaintiff's status or rights." *Sadallah v. City of Utica*, 383 F.3d 34, 38 (2d Cir. 2004) (quoting *Doe v. Dep't of Pub. Safety ex rel. Lee*, 271 F.3d 38, 47 (2d Cir. 2001)).  Defendants previously acknowledged that "[s]tatements which denigrate an individual's professional ability qualify as stigmatizing for the purposes of such a claim [] if those statements would serve as an effective roadblock to future employment in their chosen career."  Dkt. No. 16-1 at 25 (quoting *Donato v. Plainview-Old Bethpage Cent. Sch. Dist.*, 96 F.3d 623, 630-31 (2d Cir. 1996)).  And now, on summary judgment, the Parties seemingly agree that the modification to Plaintiff's Registry status from "retired" to "removal for cause based on incompetence or misconduct" resulted in the revocation of Plaintiff's basic training certification pursuant to 9 N.Y.C.R.R. § 6056.2(g)(2), which allegedly disqualifies him from holding a law enforcement position with a public employer—including serving as Sheriff.  *See* Dkt. No. 55-1 at ¶¶ 131-32; *see also* Dkt. No. 55 at 24.  Thus, the May 2021 DCJS correspondence constitutes a "stigmatizing" statement.[7]  The next question is whether Plaintiff's Registry status modification constituted a "state-imposed burden or alteration of status" that constitutes the "plus" aspect of a stigma-plus claim.  In that regard, a "stigma-plus claim may be

---

[7] Regarding Defendants' repeated contention that the statements made to DCJS were not "public," the Court refers Defendants to its previous analysis on this issue, which remains applicable.  *See* Dkt. No. 22 at 28-29 ("for stigma-plus liability to attach, the statement . . . does not necessarily need to meet a threshold related to publication into the public domain") (citing *Sadallah*, 383 F.3d at 38).

premised either on an asserted property or liberty interest." *Chisolm v. Ramia*, 639 F. Supp. 2d 240, 245 (D. Conn. 2009). The Supreme Court has held that foreclosure of the freedom to take advantage of government employment constitutes a tangible interest sufficient to satisfy the "plus" requirement of a stigma-plus claim. *See Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 573 (1972); *see also Balentine v. Tremblay*, 554 Fed. Appx. 58, 60 (2d Cir. 2014). While Defendants argue that Plaintiff was not deprived of any property interest as a result of the May 2021 DCJS correspondence, Plaintiff is not seeking recognition of a property interest—instead, Plaintiff contends he was deprived of a *liberty* interest due to the damage the correspondence caused to Plaintiff's professional reputation and the limitations it imposed on Plaintiff's ability to continue in his field. *Compare* Dkt. No. 54 at 22 *with* Dkt. No. 55 at 23-24; *see also* Dkt. No. 52-9 (letter from DCJS noting Plaintiff's removal for cause or misconduct, and that "Undersheriff Moulton's basic training certification has been invalidated effective immediately. Should a subsequent employer attempt to appoint and register Undersheriff Moulton with the Division, that prospective employer shall be notified of the regulatory reason he ceased to be previously employed."); *see also Roth*, 408 U.S. at 572-73 (discussing loss of future government employment as a sufficient liberty interest in stigma-plus context). The Second Circuit has previously recognized a liberty interest in similar contexts. *See Donato v. Plainview-Old Bethpage Cent. School Dist.*, 96 F.3d 623, 633 (2d Cir. 1996) ("the accusations made against [the plaintiff] go to the heart of her professional competence and damage her professional reputation to such an extent as to severely impede her ability to continue in the education field in a supervisory capacity. As a consequence, the defendant District deprived plaintiff of a liberty interest."); *see also Huntley v. Comm. School Bd. of Brooklyn, N.Y. School Dist. No. 14*, 543 F.2d 979, 985 (2d Cir. 1976) (citing *Paul v. Davis*, 424 U.S. 693, 702 (1976)).

For the foregoing reasons, the Court disagrees that there are "no material facts in dispute showing a violation of due process," Dkt. No. 54 at 18, and denies the Motion on that ground.

### C.  Plaintiff's Common Law Defamation Claim

Next, Defendants move for summary judgment on Plaintiff's common law defamation claim asserting that there is no material question of fact with respect to special damages.

"Generally, in order to prove defamation under New York law, a plaintiff must provide evidence of special damages, which consist of 'the loss of something having economic or pecuniary value.'" *Lan Sang v. Ming Hai*, 951 F. Supp. 2d 504, 524 (S.D.N.Y. 2013) (quoting *Celle v. Filipino Reporter Enterprises Inc.*, 209 F.3d 163, 179 (2d Cir. 2000)).  These special damages "must flow directly from the injury to reputation caused by the defamation[,] not from the effects of defamation," *Celle*, 209 F.3d at 179 (quoting *Matherson v. Marchello*, 100 A.D.2d 233, 236 (2d Dep't 1984)), and "must be fully and accurately identified, with sufficient particularity to identify actual losses," *Thai v. Cayre Group, Ltd.*, 726 F. Supp. 2d 323, 330 (S.D.N.Y. 2010) (citing *Celle*, 209 F.3d at 179).

Plaintiff does not appear to dispute the contention that he has failed to allege special damages sufficient to survive summary judgment on the common law defamation claim.  *See generally* Dkt. No. 55.  Indeed, the only injury Plaintiff contends stemmed from the alleged defamatory statements is injury to Plaintiff's reputation—which is neither economic nor pecuniary. *See* Dkt. No. 55 at 22, 24.  As Plaintiff has not opposed that aspect of the Motion and given that there is no evidence in the record setting forth any sort of monetary loss Plaintiff experienced as a result of the alleged defamatory statements, the Motion is granted with respect to the common law defamation claim.  *See, e.g.*, *Kaufman v. Columbia Memorial Hosp.*, 2 F. Supp. 3d 265, 280 (N.D.N.Y. 2014) ("Notably, Plaintiff has not opposed this aspect of Defendants' motion.  Accordingly, Defendants' motion for summary judgment on Plaintiff's claims against

Defendants . . . is granted."); *Martin-Glave v. Aventis Pharms.*, No. 3:03-cv-1482, 2007 WL 81913, at *8 (D. Conn. Jan. 8, 2007) ("Plaintiff did not address constructive discharge in its Opposition to the Motion for Summary Judgment . . . Therefore, . . . she waived it by failing to address it in her Opposition"); *Lai v. Eastpoint Intern., Inc.*, No. 99-Civ-2095, 2000 WL 1234595, at *5 (S.D.N.Y. Aug. 31, 2000) ("DKI has moved for summary judgment dismissing plaintiff's claims of negligent hiring and supervision.  Plaintiff has not opposed this aspect of the motion. Accordingly, these claims are dismissed.").[8]

### D.  Remaining Issues

The remaining issues in Defendants' Motion include: (1) municipal liability; and (2) Captain Nalepa's personal involvement.

Regarding municipal liability, the Court agrees with Plaintiff that its previous Order did not "lack [] clarity," as Defendants imply.  *See* Dkt. No. 54 at 29; Dkt. No. 55 at 27-28.  To reiterate

---

[8] While the portion of Defendants' Motion arguing for dismissal on Plaintiff's common law defamation claim briefly mentions that "Plaintiff fails to show per se defamation in the record," Dkt. No. 54 at 28, it is not clear whether Defendants are similarly seeking summary judgment on that claim.  *See* Dkt. No. 54 at 27 (arguing only that "Plaintiff's fifth state law claim for defamation fails").  To the extent that they are seeking summary judgment on that claim, that aspect of the Motion is denied.  "'Under New York law, the elements of a defamation claim are a false statement, published without privilege or authorization to a third party, constituting fault" that causes 'special harm or constitutes defamation *per se*.'"  *Jeanty v. Cerminaro*, No. 21-1974-cv, 2023 WL 325012, at *7 (2d Cir. Jan. 20, 2023) (summary order) (quoting *Peters v. Baldwin Union Free Sch. Dist.*, 320 F.3d 164, 169 (2d Cir. 2003)).  Statements that are defamatory *per se* "are actionable without pleading and proof of special damages."  *Celle*, 209 F.3d at 179 (citations and quotations omitted).  One such category of defamatory *per se* statements are those that "tend to injure another in his or her trade, business or profession."  *Liberman v. Gelstein*, 80 N.Y.2d 429, 435 (N.Y. 1992).  If a statement is defamatory *per se*, "injury is assumed," even where the plaintiff does not plead special or even actual damages.  *Celle*, 209 F.3d at 179.  The Court has already found, *supra*, that there is a material question of fact as to the falsity of the alleged defamatory statement, which must be decided by the jury.  To the extent that the falsity element is proven, the May 2021 DCJS correspondence could reasonably fall into the aforementioned *per se* category, as Plaintiff claims it impacted his reputation in his lifelong profession in a way that impeded his ability to seek future employment.  *See* Dkt. No. 22 at 37-38.

the prior holding, Plaintiff initially brought a separate *Monell* liability claim in addition to his three Section 1983 claims. *See* Dkt. No. 14 at ¶¶ 171-78. Doing so was duplicative, since *Monell* does not provide a separate cause of action against a municipal entity. *See* Dkt. No. 22 at 34 n.24 (citing *Benacquista v. Spratt*, 217 F. Supp. 3d 588, 599 (N.D.N.Y. 2016)). As a result, the Court dismissed Plaintiff's *Monell* claim; thus, Defendants' renewed request in the Motion that "Plaintiff's Monell claim [] be dismissed," Dkt. No. 54 at 30, is denied as moot. Nevertheless, on the merits, governmental liability under Section 1983 attaches if a plaintiff can prove that "action pursuant to official municipal policy" caused the alleged constitutional injury. *Connick v. Thompson*, 563 U.S. 51, 60-61 (2011) (internal quotation marks omitted). "[W]here a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a deliberate choice, that acquiescence may be properly thought of as a city policy or custom that is actionable under § 1983." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 126 (2d Cir. 2004). Here, Plaintiff brings forth evidence that he filed a Statement of Law and Facts on August 2, 2021, requesting that Defendant Tioga County retract the May 2021 DCJS correspondence and Registry status modification pursuant to 9 N.Y.C.R.R. § 6056.7, which Tioga County did not do. *See* Dkt. No. 55-1 at ¶ 215. Defendants make no argument regarding whether this constituted deliberate indifference sufficient for municipal liability to attach. Indeed, Defendants do not mention anywhere in the Motion facts about the County's action (or lack thereof) in August 2021 or Plaintiff's alleged filing of the Statement of Law and Facts, and dispute entirely that Plaintiff engaged in any internal DCJS appeal system. *See generally* Dkt. Nos. 54, 56; *see also* Dkt. No. 55-1 at ¶¶ 166-67. Since issues of fact remain regarding whether the County acted in a manner that was deliberately indifferent within the meaning of Section 1983, the Court denies the Motion to the extent it seeks dismissal of Defendant Tioga County.

Regarding Defendants' argument that Plaintiff has failed to show facts establishing Captain Nalepa's personal involvement in the alleged deprivation of Plaintiff's rights, a cursory review of the record belies this contention. Dkt. No. 54 at 30 (citing *Zdziebloski v. Town of E. Greenbush*, 336 F. Supp. 2d 194, 201-02 (N.D.N.Y. 2004)). First, the Parties agree that "Sheriff Howard tasked Captain Nalepa with contacting DCJS regarding changing Plaintiff's retirement status," Dkt. No. 55-1 at ¶ 113, and the record is replete with facts from which a reasonable jury could conclude that Captain Nalepa was personally involved in the alleged deprivation of Plaintiff's rights. For example, Captain Nalepa was DCJS's main point of contact during the entire May 2021 inquiry into Plaintiff's retirement status. *See generally* Dkt. No. 52-9. Captain Nalepa was the individual who communicated with DCJS as to how TCSD should proceed in light of the new misconduct allegations lodged against Plaintiff and was subsequently "informed by DCJS that the appropriate designation for Plaintiff should be changed." Dkt. No. 55-1 at ¶¶ 120-21; *see also id.* at ¶ 129. Additionally, while the May 2021 letter altering Plaintiff's retirement status was ultimately signed by Sheriff Howard, Defendants appear to concede that Captain Nalepa was the individual who authored it. *See, e.g.*, *id.* at ¶¶ 166 ("May 2021 letter by Defendant Nalepa"); 168 ("decision based on Defendant Nalepa's May 2021 letter"). It also appears that Captain Nalepa's observations of Plaintiff in May 2020 supported Defendants' ultimate decision to give Plaintiff the ultimatum to resign or be terminated. *See id.* at ¶ 61. At the very least, the extent of Captain Nalepa's personal involvement in Plaintiff's alleged constitutional violations is an issue of fact within the meaning of Fed. R. Civ. P. 56(c). *See, e.g.*, *Moffitt v. Town of Brookfield*, 950 F. 2d 880, 886 (2d Cir. 1991). Therefore, the Motion is denied as to the request that Captain Nalepa be dismissed as an individual defendant.

## V.    CONCLUSION

Accordingly, the Court hereby

**ORDERS** that Defendants' Motion, Dkt. No. 52, is **GRANTED in part** and **DENIED in part**, as set forth in Section IV of this Memorandum-Decision and Order; and the Court further

**ORDERS** that Plaintiff's claim in the Amended Complaint, Dkt. No. 14, for common law defamation is **DISMISSED**; and the Court further

**ORDERS** that the Clerk serve a copy of this Memorandum-Decision and Order on the Parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: <u>November 20, 2024</u>
       Albany, New York

Anne M. Nardacci
U.S. District Judge